**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

**UNITED STATES OF AMERICA, STATES OF CALIFORNIA, COLORADO, CONNECTICUT, DELAWARE, FLORIDA, GEORGIA, HAWAII, ILLINOIS, INDIANA, LOUISIANA, MARYLAND, MASSACHUSETTS, MICHIGAN, MINNESOTA, MONTANA, NEW HAMPSHIRE, NEW JERSEY, NEW MEXICO, NEW YORK, NORTH CAROLINA, OKLAHOMA, RHODE ISLAND, TENNESSEE, TEXAS, VIRGINIA and WISCONSIN and the DISTRICT OF COLUMBIA ex rel. ALEX BOOKER and EDMUND HEBRON**

**Plaintiffs** **CASE NO. 1:10-CV-11166-DPW**

**v.**

**PFIZER, INC.**

**Defendant**

______________________________________/

**FOURTH AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**

## INTRODUCTION

1. Relators Alex Booker and Edmund Hebron bring this action on behalf of the United States against Pfizer, Inc. pursuant to the qui tam provisions of the False Claims Act, 31 U.S.C. §3729 *et seq.* and on behalf of the Plaintiff States under their respective State False Claims Acts.

2. Pursuant to 31 U.S.C. §3730(b)(2) and comparable provisions in State False Claims Acts, this action was filed under seal.

3. Relator Booker also brings this action on his own behalf under 31 U.S.C. §3730(h) seeking redress for Pfizer's wrongful and unlawful termination of his

employment in retaliation for his attempts to report and correct the charged False Claims Act violations.

4. This complaint demonstrates Pfizer's corporate plan and pattern of illegally promoting off-label prescriptions billed to the Medicare and Medicaid programs, as well as to other Federal health care programs.

5. As required by the False Claims Act, 31 U.S.C. §3730(b)(2), Relators have provided previously to the Attorney General of the United States, to the United States Attorney for the District of Massachusetts, and to the Attorney Generals of the Plaintiff States a statement of all material evidence and information related to the Third Amended Complaint. This disclosure statement is supported by material evidence known to Relators establishing the existence of Defendant's false claims. Because the disclosure statement includes attorney-client communications and work product of Relators' attorneys, and is submitted to the Attorney General, to the United States Attorney, and the Plaintiff States in their capacity as potential co-counsel in this litigation, Relators understand this disclosure to be confidential.

**JURISDICTION AND VENUE**

6. This Court has jurisdiction over this action under the False Claims Act pursuant to 31 U.S.C. §3732(a) and §3730(b) and 28 U.S.C. §1331 and §1345 and has supplemental jurisdiction over the State FCA claims pursuant to 31 U.S.C. §3732(b) and 28 U.S.C. §1367.

7. Venue is appropriate in the District of Massachusetts under 28 U.S.C. §1391(b) and (c) and 31 U.S.C. §3732(a) because Pfizer, Inc. can be found in and transacts business in this District.

**THE PARTIES**

8. Relator Alex D. Booker is a resident of Chesterfield, Missouri. Relator Booker was employed by Pfizer, Inc. for eighteen years, from June 1991 through January 6, 2010. Relator Booker received a B.S. in Communications from Northwestern University and an M.B.A. from Northern Illinois University.

9. Relator Booker began his career at Pfizer in June 1991 as a Sales Representative in Chesterfield, Missouri promoting cardiovascular and arthritis products including Feldene, Procadia XL and Glucotrol. In 1998, Relator Booker was promoted to Specialist Sales representative to promote Viagra, Trovan, and Zithromax to gynecologists and urologists in Southern Illinois and Kentucky. Relator Booker returned to Chesterfield, Missouri in 1999 as a Specialist Representative to promote Zithromax, Diflucan and Zoloft to pediatricians and allergists.

10. In 2002 Pfizer eliminated the Pediatric / Allergy / Ear Nose Throat Division and Relator Booker was transferred to the expanding Neuroscience Division in St. Louis, in Pfizer's South Region, as one of its more successful sales representatives. Here Relator Booker promoted Zoloft, Geodon, Lyrica, Aricept and Pristiq as a Specialist Representative to hospitals and office-based psychiatrists. He remained there as a very successful sales representative until he was abruptly terminated on January 6, 2010.

11. Relator Booker earned multiple awards during his Pfizer career including district sales representative of the year in 1992, 2000, 2001 and 2005. He was awarded three Vice President's Cabinet Awards, Pfizer's highest sales award, in 2000, 2001 and 2005.

12. Relator Booker earned two national awards for Geodon sales in July and September of 2009. Relator Booker received a district award for achieving formulary acceptance of Geodon at the Poplar Bluff Hospital, Poplar Bluff, Missouri. Relator Booker had the highest sales in his district and ranked in the top five percent of sales in his region of 91 sales representatives in the fourth quarter of 2009.

13. Relator Edmund J. Hebron is a resident of Highland, Illinois. Relator Hebron was employed by Pfizer, Inc. for nine years, from January 15, 1997 through June 1, 2006. Relator Hebron graduated from the United States Air Force Academy in 1990 with a B.S. in Management and received his M.B.A. in Aviation Management from Embry-Riddle Aeronautical University in 1994.

14. As a First Lieutenant, Relator Hebron was assigned to Minot Air Force Base in North Dakota as the Production Flight Officer-in-Charge. He was responsible for supervising the enlisted personnel and running the flight line, which consisted of 16 B-52 aircraft. During his tenure, his unit earned the 8th Air Force Maintenance Effectiveness Award and an "Excellent" rating.

15. Upon promotion to Captain, Relator Hebron was assigned to the United States Air Force Academy in Colorado as its Training Director of Professional Development. While assigned to the Air Force Academy, Relator Hebron developed and integrated a Character-Based Leadership Development Model into required cadet training.

16. While assigned to the Air Force Academy, Relator Hebron graduated from the Air Force's Squadron Officer School located at Maxwell Air Force Base in Montgomery, Alabama. He was then selected to become the Process

Improvement/Quality Control Advisor to the Air Force Academy's Commandant of Cadets. Here Relator Hebron was responsible for integrating Process Improvement/Quality Control into the day-to-day operations of the 5,000 person military training organization at the United States Air Force Academy. Relator Hebron's last assignment in the Air Force was as an Action Officer for Brigadier General Lorenz, Commandant of Cadets. Relator Hebron resigned his commission in January 1997 but, remained in the Air Force In-Active Reserves until he was honorably discharged in December 2005.

17. Relator Hebron began his career at Pfizer, Inc. in January 1997 as a Territory Sales representative in Rapid City, South Dakota promoting antibiotic, antidepressant, antifungal, dementia, and urological products including Unasyn, Zithromax, Zoloft, Diflucan, Aricept, and Cardura. Relator Hebron was promoted in 1998 to Specialty Therapeutic Sales representative to promote Viagra, Trovan, Diflucan and Zithromax to gynecologists and urologists in Wisconsin and Michigan. Relator Hebron returned to St. Louis, Missouri in 1999 as a Specialty Therapeutic Sales representative to promote Zithromax, Diflucan, Trovan and Zoloft to pediatricians and allergists.

18. In 2002 Pfizer eliminated the Pediatric / Allergy / Ear Nose Throat Division and Relater Hebron was transferred to the expanding Neuroscience Division in St. Louis, Missouri within Pfizer's South Region. Here Relator Hebron promoted Zoloft, Geodon and Aricept as a Specialist Representative to hospitals and office-based psychiatrists. He remained here as a very successful sales representative until he was

displaced and transferred to the Pain Division to promote Celebrex, Lyrica, and Exubera in the fall of 2005.

19. Relater Hebron had just achieved a formulary victory for Celebrex at Scott Air Force Base Hospital located in O'Fallen, Illinois when he was abruptly terminated on June 1, 2006, the day before he was to leave for his 2005 Vice President's Cabinet Award trip.

20. Relater Hebron earned multiple sales performance awards and peer-leadership recognition during his Pfizer career including:

- 2005: Vice President's Cabinet Sales Award Winner (Pfizer's most prestigious award)
- 2005: Ascending Eagle Award and St Louis Pfizer Alliance Team of the Year Award Winner Finished — 5th/45 Reps Regionally
- 2001: Voted by Chicago District Peers — Ped/Allergy Division's Specialty Academy in Leadership Advisory Board
- 1999: Voted by St. Louis District Peers — Ped/OBGYN Division's Specialty Academy in Leadership Advisory Board
- 1999: Pfizer Pediatric/OBGYN Division's Vice President's Cabinet Sales Award Winner
- 1999: Midwest Regional Circle of Excellence Award Winner — St Louis District's Rep of the Year
- 1998-2001: Selected to be a guest trainer for New York Pfizer Initial Sales Training Classes — three different times

21. Pfizer, Inc. is a pharmaceutical company based in New York City ranked number one in sales in the world. In September 2009, Pfizer entered a settlement agreement with the Department of Justice under which it agreed to pay $2.3 billion to settle civil and criminal allegations that it had illegally promoted the sale of Bextra, Geodon, Zyvox, and Lyrica for off-label uses. In April 2007, Pfizer entered a settlement agreement with the Department of Justice and agreed to pay $34.7 million to settle allegations that it illegally promoted the human growth hormone product Genotropin. In

May 2004, Pfizer agreed to pay $430 million to settle Department of Justice claims involving the off-label promotion of the epilepsy drug Neurontin by subsidiary Warner-Lambert. In October 2002, Pfizer and subsidiaries Warner-Lambert and Parke-Davis agreed to pay $49 million to settle allegations that the company fraudulently avoided paying full rebates for the cholesterol-lowering drug Lipitor to the states and federal governments under the Medicaid national rebate program.

22. Pfizer manufactures both Pristiq (devsvenlafaxine) and Geodon (ziprasidone).

**FEDERAL AND STATE HEALTH INSURANCE PROGRAMS**

23. The Medicare program, Title XVIII of the Social Security Act, 42 U.S.C. §1395 *et seq.*, (hereinafter "Medicare") is a health insurance program administered by the United States Government that is funded by taxpayer revenue. The program is overseen by the United States Department of Health and Human Services through its Centers for Medicare and Medicaid Services ("CMS"). Medicare was designed to be a health insurance program and to provide for the payment of hospital services, medical services and durable medical equipment to persons over sixty-five (65) years of age and others that qualify under the terms and conditions of the Medicare program. Payments made under the Medicare program include payment for certain prescription drugs used during treatment at an appropriate medical facility and under Part D of the Medicare program, the Medicare prescription drug benefit effective in January 2004.

24. The Medicaid program, Title XIX of the Social Security Act, 42 U.S.C. §1396-1396v (hereinafter "Medicaid") is a health insurance program administered by the United States and the various individual States (and territories) and is funded by state and

federal taxpayer revenue. The Medicaid program is overseen by the United States Department of Health and Human Services through CMS. Medicaid was designed to assist participating states in providing medical services, durable medical equipment and prescription drugs to financially needy individuals that qualify for Medicaid. States also use taxpayer revenue to fund other health insurance programs for children and/or adults, including, for example, the so-called S-CHIPS program, see 42 U.S.C. section §1397dd(a)-(c), and in Massachusetts the so-called Uncompensated Care Pool.

25. The Civilian Health and Medical Program of the Uniformed Services ("CHAMPUS") (now known as "TRICARE"), 10 U.S.C. §1071-1106, provides benefits for health care services furnished by civilian providers, physicians, and suppliers to members of the Uniformed Services and to spouses and children of active duty, retired and deceased members. The program is administered by the Department of Defense and funded by the Federal Government. CHAMPUS /TRICARE pays for, among other items and services, prescription drugs for its beneficiaries.

26. The federal government, through its Departments of Defense and Veterans Affairs, Bureau of Prisons, Native and American Indian Health Services, and Public Health Services maintains and operates medical facilities including hospitals, and receives and uses federal funds to purchase prescription drugs for patients treated at such facilities and otherwise. In addition, under the Public Health Service Act, the Section 340B Drug Pricing Program, and the Veterans Health Care Act of 1992, the federal government directly or indirectly provides funds to certain other federal agencies and to state and local facilities and programs, including to non-profit disproportionate share hospitals ("DSH"). *See generally* 38 U.S.C. §8126; 42 U.S.C. §256b.

27. The Federal Employees Health Benefits Program ("FEHBP") provides health care benefits for qualified federal employees and their dependents. It pays for, among other items and services, prescription drugs for its beneficiaries. (Together these programs described in paragraphs 23-27 shall be referred to as "Government Health Care Programs").

## RELEVANT FEDERAL AND STATE LAWS

### Prescription Drug Reimbursement Under Medicaid and Other Federal Health Care Programs

28. Medicaid is a public assistance program providing for payment of medical expenses for the poor and disabled. Funding for Medicaid is shared between the federal government and state governments. The Medicaid program subsidizes the purchase of more prescription drugs than any other program in the United States.

29. Although Medicaid is administered on a state-by-state basis, the state programs adhere to federal guidelines. The federal Medicaid statute sets forth the minimum requirements for state Medicaid programs to qualify for federal funding, which is called federal financial participation. 42 U.S.C. §1396 *et seq*.

30. Federal reimbursement for prescription drugs under the Medicaid program is available for "covered outpatient drugs." 42 U.S.C. §1396(1)(10), §1396r-8(k)(2), (3). Covered outpatient drugs are drugs that are used for "a medically accepted indication." Id. §1396r-8(k)(3).

31. A medically accepted indication, in turn, is a use which is listed in the labeling approved by the FDA, or that is including in one of the drug compendia identified in the Medicaid statute. Id. §1396r-8(k)(3). During the time period relevant to this Complaint, the off-label uses of Geodon and Pristiq promoted by Pfizer were not

eligible for reimbursement from Medicaid because the off-label uses promoted by Pfizer were neither listed in the labeling approved by the FDA nor included in the drug compendia specified by the Medicaid statute.

32. In addition to Medicaid, the federal government reimburses a portion of the cost of prescription drugs under several other federal health care programs, including but not limited to CHAMPUS/TRICARE, CHAMPVA, the Federal Employees Health Benefit Program, and Part D of the Medicare program.

33. CHAMPUS/TRICARE, administered by the United States Department of Defense, is a health care program for individuals and dependents affiliated with the armed forces. CHAMPVA, administered by the United States Department of Veterans Affairs, is a health care program for the families of veterans with 100 percent service-connected disability. The Federal Employee Health Benefit Program, administered by the United States Office of Personnel Management, provides health insurance for federal employees, retirees, and survivors. Coverage of Geodon and Pristiq prescriptions under these programs is similar to coverage under the Medicaid program. See, e.g., TRICARE Policy Manual 6010.47-M, Chapter 7, Section 7.1(B)(2) (March 15, 2002); CHAMPVA Policy Manual, Chapter 2, Section 22.1, Art. (A)(2) (June 6, 2002).

34. Similarly, the Medicare Benefit Policy Manual provides that Medicare coverage "of an outpatient drug for an off-label use occurs only where the use is medically accepted, taking into account the major drug compendia (e.g., Drugdex, American Hospital Formulary Service, and U.S. Pharmacopeia-Drug Information), authoritative medical literature, and/or accepted standards of medical practice." The "medically accepted" requirement derives from applicable statutory language in 42

U.S.C. §1395y(a)(1)(A) limiting Medicare coverage to services that are "reasonable and necessary".

**FDA Prohibition on The Promotion of Off-Label Indications**

35. Under the Food, Drug, and Cosmetics Act ("FDCA"), 21 U.S.C. §301-97, new pharmaceutical drugs cannot be marketed in the United States unless the sponsor of the drug demonstrates to the satisfaction of the FDA that the drug is safe and effective for each of its intended uses. 21 U.S.C. §355(a) & (d). Approval of the drug by the FDA is the final stage of a multi-year process of study and testing.

36. The FDA does not approve a drug for treatment of sickness in general. Instead, a drug is approved for treatment of a specific condition, for which the drug has been tested in patients. The specific approved use is called the "indication" for which the drug may be prescribed. The FDA will specify particular dosages determined to be safe and effective for each indication.

37. The indications and dosages approved by the FDA are set forth in the drug's labeling, the content of which must also be reviewed and approved by the FDA. 21 U.S.C. §352, 355(d). An example of the drug's labeling is the printed insert in the drug's packaging. The FDA will only approve the new drug application if the labeling conforms to the uses and dosages that the FDA has approved. 21 U.S.C. §355(d).

38. Under the Food and Drug Administration Modernization Act of 1997 ("FDAMA"), if a manufacturer wishes to market or promote an approved drug for alternative uses – i.e., uses not listed on the approved label – the manufacturer must resubmit the drug for another series of clinical trials similar to those for the initial approval. 21 U.S.C. §360aaa(b) & (c). Until subsequent approval of the new use has

been granted, the unapproved use is considered to be "off-label." "Off-label" refers to the use of an approved drug for any purpose, or in any manner, other than what is described in the drug's labeling. Off-label use includes treating a condition not indicated on the label, treating the indicated condition at a different dose or frequency than specified in the label, or treating a different patient population (e.g., treating a child when the drug is approved to treat adults).

39. The FDA is responsible for ensuring that a drug is safe and effective for the specific approved indication. However, the FDA does not regulate the practice of medicine. Once a drug is approved for a particular use, the FDA does not prohibit doctors from prescribing the drug for uses that are different than those approved by the FDA.

40. Although physicians may prescribe drugs for off-label usage, the law prohibits drug manufacturers from marketing or promoting a drug for a use that the FDA has not approved. Specifically, under the Food and Drug laws, (1) a manufacturer may not introduce a drug into interstate commerce with an intent that it be used for an off-label purpose, and (2) a manufacturer illegally "misbrands" a drug if the drug's labeling (which includes all marketing and promotional materials relating to the drug) describes intended uses for the drug that have not been approved by the FDA. 21 U.S.C. §331, 352.

41. An off-label use of a drug can cease to be off-label only if the manufacturer submits a supplemental application and demonstrates to the satisfaction of the FDA that the product is safe and effective for the proposed new use. 21 U.S.C. §360aaa(b) & (c).

42. In addition to prohibiting manufacturers from directly marketing and promoting a product's off-label uses, Congress and the FDA have also sought to prevent manufacturers from employing indirect methods to accomplish the same end. For example, Congress and the FDA have attempted to regulate two of the most prevalent indirect promotional strategies: (1) manufacturer dissemination of medical and scientific publications concerning the off-label uses of their products and (2) manufacturer support for Continuing Medical Education ("CME") programs that focus on off-label uses.

43. With regard to the first practice, disseminating written information, the FDAMA only permits a manufacturer to disseminate information regarding off-label usage in response to an "unsolicited request from a health care practitioner." 21 U.S.C. §360aaa-6 (emphasis added). In any other circumstance, a manufacturer is permitted to disseminate information concerning the off-label uses of a drug only after the manufacturer has submitted an application to the FDA seeking approval of the drug for the off-label use; has provided the materials to the FDA prior to dissemination; and the materials themselves must be in an unabridged form and must not be false or misleading. 21 U.S.C. §360aaa(b) & (c); 360aaa-1.

44. With regard to manufacturer involvement in CME programs, the FDA's examination of these practices led to publication of an agency enforcement policy in 1997 entitled, "Guidance for Industry: Industry-Supported Scientific and Educational Activities, " 62 Fed. Reg. 64,074, 64,093, 1997 WL 740420 (F.R.)(1997). This guidance document states that CME programs must be truly independent of the drug companies, and sets forth a number of factors that the FDA will consider in determining whether a program is "free from the supporting company's influence and bias." Id. These factors

include, among others, an examination of the relationship between the program provider and supporting company, the company's control of content and selection of presenters, whether there is a meaningful disclosure of the company's funding and role in the program, whether multiple presentations of the same program are held, whether the audience is selected by the sales and marketing department of the company, and whether information about the supporting company's product is disseminated after the initial program other than in response to an unsolicited request. Id. The promotion of off-label drug uses at a CME programs which fails this test of "independence", violates Congress' off-label marketing restrictions.

45. In sum, the FDA prohibits drug companies from promoting approved drugs for unapproved uses or from making misleading claims as to the drug's safety or effectiveness. See 21 U.S.C. §331,352,355(d). This off-label regulatory scheme protects patients and consumers by ensuring that drug companies do not promote drugs for uses other than those found to be safe and effective by an independent, scientific government body, the FDA.

46. "[A]n off-label prescription submitted for reimbursement by Medicaid [and Medicare] is a false claim within the meaning of the FCA." *United States ex rel. Franklin v. Parke-Davis, Division of Warner-Lambert Co.,* 147 F.Supp. 2d 39, 51 (D. Mass. 2001). "The fact that such prescriptions are for an off-label use is material because ... the government would not have paid the claims if it had known of the use for which they were being submitted." *Id.* at 53.

47. A defendant acts recklessly under the False Claims Act when it encourages an off-label use of a drug without evidence supporting the efficacy of the

drug in the off-label context. *Strom ex rel. United States v. Scios, Inc.*, 676 F.Supp.2d 884, 891 (N.D. Cal. 2009).

48. A pharmaceutical company violates the False Claims Act when it is "engaged in an unlawful course of fraudulent conduct including knowingly making false statements to doctors that caused them to submit claims that were not eligible for payment by the government under Medicaid." *Franklin*, 147 F.Supp.2d at 52.

**PFIZER STRATEGIC PLAN FOR OFF-LABEL PROMOTION**

49. Since 1999, Pfizer has replaced using its Research and Development division as a source of new drug products with an acquisition strategy. Under this plan, Pfizer targets selected drug products and then acquires the pharmaceutical company that owns the targeted product.

50. The second plank in Pfizer's strategic plan is pushing the acquired product into popular markets beyond whatever indications the FDA has approved. In furtherance of this tactic, Pfizer deploys its' extensive sales representative force out into the field armed with a variety of tactics designed to push the newly acquired product beyond the FDA approved indications into a variety of off-label uses. This has the effect of setting revenue records in virtually every situation.

51. The third plank in the Plan is the termination of anyone who even suggests that the Pfizer off-label promotion tactics are inappropriate. This plank is implemented in ruthless fashion, even to veteran employees.

52. In most cases, Pfizer has been met with a False Claims Act qui tam case aimed at the off-label practices. When the case is intervened then it eventually moves to resolution. This is necessary to Pfizer's plan because while the settlement process is

unfolding, Pfizer is already moving on to its next acquisition implementing all of the same tactics or similar tactics or "smarter" tactics with respect to the promotion of the newly acquired product. Meanwhile, Pfizer's sales representatives are directed to reengage their off-label promotions with respect to the drugs covered in the most recent settlement.

53. The net result is that Pfizer's total corporate revenues have soared over the last ten years and the various settlement costs, fees and charges are viewed in effect as a cost of sales, and not a very large cost at that, all things considered.

54. Pfizer's strategic plan is illustrated graphically as follows:

| **Drug** | **NEURONTIN** | **BEXTRA** | **GEODON** | **LYRICA** | **ZYVOX** | **PRISTIQ** |
|---|---|---|---|---|---|---|
| | | | | | | |
| **Original Manufacturer** | Parke-Davis | Pharmacia Upjohn | Pharmacia Upjohn | Pharmacia Upjohn | Pharmacia Upjohn | Wyeth |
| | | | | | | |
| **Date of Acquisition by Pfizer** | 2000 | 2003 | 2003 | 2003 | 2003 | 2009 |
| | | | | | | |
| **Date of Settlement** | 2004 | 2009 | 2009 | 2009 | 2009 | TBD |
| | | | | | | |
| **Amount of Settlement** | $430,000,000 | $502,000,000 | $301,000,000 | $48,000,000 | $98,000,000 | TBD |

## PFIZER REPEATEDLY PROMOTED GEODON OFF-LABEL IN MULTIPLE WAYS FROM 2008 TO THE PRESENT.

### A. Pfizer promoted Geodon for numerous unapproved indications.

55. Geodon (ziprasidone) is approved by the FDA for the treatment of schizophrenia, as monotherapy for the acute treatment of bi-polar manic or mixed episodes, and as an adjunct to lithium or valproate for the maintenance treatment of : disorder. Geodon Intramuscular is approved by the FDA for treatment of acute agitation in schizophrenic patients.

56. Despite having entered a settlement agreement with the Department of Justice in August 2009 covering, among other things, Pfizer's efforts to promote off-label sales of Geodon between January 2001 and December 31, 2007, Pfizer is continuing to promote the off-label use of Geodon by directing Pfizer sales representatives to promote off-label sales of Geodon from January 2008 to the present by making misleading statements to physicians based on misrepresentations of multiple clinical studies.

57. Pfizer promoted Geodon as an unapproved treatment to improve cognition:

a. Geodon is not approved to improve cognition.

b. Despite that, the Geodon Disease Management Team in 2008-2010 promoted Geodon as improving cognition in the "Efficacy in Cognition" slide in a presentation titled "GEODON in the Treatment of Schizophrenia and Acute : Manic or Mixed Episodes." **Exhibit 1**.

c. Following a sales call on Dr. Saad Khan in February 2009, Kansas-Missouri District Manager Jon Twidwell told Relator Booker that all Geodon patients have improvements in their cognitive functions.

d. After a sales call on Dr. Radhika Rao in September 2009, District Manager Twidwell told Relator Booker to emphasize to physicians how Geodon improves cognition in : patients based on a clinical study by Philip Harvey. **Exhibit 2.**

e. At the district POA meeting on September 16, 2009, District Manager Twidwell directed his reps to use the Harvey clinical study and the Stahl clinical study (**Exhibit 3**) to promote that Geodon improves cognition in : patients. **Exhibit 4.**

58. Pfizer promoted Geodon as an approved treatment to reduce agitation and aggression:

a. Geodon is not approved to reduce agitation and aggression.

b. Nevertheless, the Geodon Disease Management Team in 2008-2010 promoted Geodon as reducing agitation in the marketing aid titled as "Geodon: Effects on PANSS Excitement subscale by Agitation Levels at Baseline". **Exhibit 5.**

c. At the district POA meeting on September 16, 2009, District Manager Jon Twidwell directed his reps to use the Citrome and Stahl clinical studies to promote that Geodon improves symptoms of aggression and overt anger. **Exhibit 4.**

d. After a sales call on Dr. Michael Statler on October 14, 2009, District Manager Twidwell coached Relator Booker to use the Citrome clinical study to promote Geodon as being better at improving overt anger than Abilify. **Exhibit 6.**

59. Pfizer promoted Geodon as an unapproved treatment to improve patients' functionality:

a. Geodon is not approved to improve patients' functionality.

b. In spite of that, in August 2008 the Geodon Disease Management Team instituted a program with the acronym "VIGOR" (Vocation, Independence, Goals,

Ownership, Relationships) to promote Geodon as a means "to perform at work/school" and "to improve overall quality of life"." **Exhibit 7**.

c. In November 2008, the Geodon Disease Management Team and the Director of Sales Operations emailed all Psychiatry Division reps to promote a "Geodon Growth Strategy" titled "Broadening the Base". As part of this marketing approach, reps were instructed to ask physicians to "think of a patient who has a personal goal of working a part-time job? This is the Geodon patient!" **Exhibit 8.**

d. In 2008-2010, the Geodon Disease Management Team promoted Geodon as causing "significant improvement in symptoms of social impairment" in the marketing brochure titled "GEODON in the Treatment of Schizophrenia and Acute : Manic or Mixed Episodes". **Exhibit 9**.

60. Pfizer promoted Geodon as an unapproved long-term treatment for : disorder:

a. Geodon is not approved as a long-term treatment for : disorder.

b. Despite that, the Geodon Disease Management Team developed and distributed several marketing aids to promote Geodon for : maintenance, including a promotional DVD was filmed at the April 2008 national sales meeting. In it, a real Geodon patient spoke about how Geodon worked for her as a : maintenance therapy. This DVD was distributed by the Geodon Disease Management Team to Pfizer reps to convince physicians that Geodon was effective as a long-term therapy for : disease.

c. Similarly, the Geodon Disease Management Team distributed a visual aid in 2008 and 2009 to promote Geodon as a : maintenance treatment by discussing a one-year extension study. **Exhibit 10**.

d. From September 2008 throughout 2009, Pfizer created a Geodon promotional campaign for doctors who were managing patients with bi-polar disorder. The program, which is titled "Real Patients – Real Goals" and was promotional material #GZU00492, was designed to recruit patients to take Geodon for long-term bi-polar disorder. The program asked patients to share positive personal experiences about the long-term control of their bi-polar disorder by taking Geodon. This program implied to doctors and patients that Geodon was indicated for long-term use in bi-polar disorder, even though Geodon is not indicated as monotherapy for long-term bi-polar disorder.

e. In August 2009, District Manager Jon Twidwell directed Relator Booker to request a medical inquiry for Dr. Ellen Bhuyan showing Geodon's use for : maintenance.

f. At a district POA meeting on September 16, 2009, District Manager Twidwell directed his reps to use the Weiden clinical study to promote Geodon for long-term use. **Exhibit 4**.

g. Until his termination in January 2010, Relator Booker promoted Geodon as a mono-therapy agent for : maintenance, including to Dr. Hemachandra Gunawardhana, Dr. Jordan Balter, Dr. Shajitha Nawaz, and Dr. Naveed Mirza. Approximately 50 percent of Dr. Gunawardhana's and Dr. Balter's patients were Medicaid recipients, while about 80 percent of Dr. Nawaz's patients were Medicaid recipients. Dr. Mirza also had a large Medicaid patient population. Pfizer thereby knowingly caused Dr. Gunawardhana, Dr. Balter and Dr. Nawaz to submit off-label claims to Medicaid.

61. Pfizer promoted Geodon as an unapproved treatment for : depression:

a. Geodon is not approved to treat : depression.

b. However, the Geodon Disease Management Team created and disseminated multiple marketing aids to promote Geodon for : depression.

c. For instance, a marketing aid distributed from April 2008 through 2009 states that "GEODON significantly improves symptoms of depression associated with manic or mixed episodes." **Exhibit 11**.

d. This same pitch was made in a 2009 slide developed by the Geodon Disease Management Team. **Exhibit 12**.

e. Four separate Geodon marketing brochures used by Pfizer reps in 2009 and 2010 promoted Geodon for the off-label indication of depression. ("Treat with the Body in Mind"; "Realize the Possibilities"; "Important considerations when evaluating patients with manic or mixed episodes ..."; and "GEODON in the Treatment of Schizophrenia and Acute : Manic or Mixed Episodes"). **Exhibits 13, 14 and 15**.

f. Pfizer supplied its Geodon sales reps in 2008-2010 with the Papakostas clinical study which "suggest[s] a possible augmentation role for ziprasidone [Geodon] when used in conjunction with SSRIs in SSRI-resistant MDD {major depressive disorder]." **Exhibit 16**.

g. At the district POA meeting on September 16, 2009, District Manager Jon Twidwell directed his reps to use the Daniel clinical study to promote Geodon to treat depression. **Exhibit 4**. The Daniel clinical study found that "Ziprasidone 160 mg/day significantly improved depressive symptoms in patients with clinically significant depression...." **Exhibit 17**.

62. Pfizer promoted Geodon as an unapproved weight loss drug for mentally ill patients:

a. Geodon is not approved as a weight loss drug.

b. Nevertheless, the Geodon Disease Management Team in 2008-2010 developed and distributed marketing aids to reps promoting Geodon as a weight loss drug for mentally ill patients.

c. For example, one marketing aid stated that "GEODON has a low potential for weight gain." **Exhibit 18**.

d. Another marketing aid promoted that Geodon has a "neutral weight profile." **Exhibit 19**.

63. Pfizer promoted Geodon as an unapproved cholesterol and lipid lowering drug for mentally ill patients:

a. Geodon is not approved as a cholesterol and lipid lowering drug.

b. Despite that, the Geodon Disease Management Team in 2008-2010 created and disseminated marketing aids to reps promoting Geodon as a cholesterol and lipid lowering drug for mentally ill patients.

c. For instance, physicians were advised to "Consider the impact of GEODON on lipids" (**Exhibit 20**) and were told that "GEODON has a minimal effect on cholesterol and triglycerides" (**Exhibit 21**).

64. Pfizer promoted Geodon as an unapproved sleep aid:

a. Geodon is not approved as a sleep aid.

b. In spite of that, following a sales call on Dr. Radhika Rao in September 2009, District Manager Jon Twidwell told Relator Booker to emphasize to physicians how Geodon improved patients' sleep.

65. Relator Booker used these Pfizer marketing materials to promote Geodon for off-label indications:

a. Alex Booker confirmed that all of these Pfizer marketing materials were in use when he was fired in January 2010, months after the August 2009 mega-settlement and long after December 31, 2007, the end of the Geodon "covered conduct" period in the DOJ settlement agreement. Only one of the enclosed marketing materials, "Treat With the Body in Mind", was withdrawn from the field by Pfizer management, probably in 2010.

b. Regional Manager Jack Shoemaker and District Manager Stephanie Bartels instructed reps to order these materials on-line and send them out. Regional Manager Shoemaker checked to make sure reps were in fact ordering these materials.

**B. Pfizer promoted Geodon off-label to treat children and adolescents.**

66. Pfizer directed its reps to promote Geodon to psychiatrists specializing in treating children and adolescents:

a. From January 2008 to the present Pfizer has promoted off-label sales of Geodon to psychiatrists specializing in children and adolescents even though Geodon has no FDA-approved indication for use by children and adolescents.

b. Geodon is a type of prescription medication referred to as a psychotropic, also known as an atypical antipsychotic. Prior to December 2009, Geodon was approved by the FDA only for the treatment of symptoms of schizophrenia and acute mania or

mixed episodes associated with bi-polar disorder in adults. There is no body of evidence available from controlled trials to guide a clinician in the treatment of children with Geodon and Geodon has no indication at all for children or adolescents. In December 2009, Geodon received a narrow indication from the FDA as an adjunct to lithium or valporate for the maintenance treatment of bi-polar disorder. However, at the same time, the FDA advised Pfizer that its request that Geodon be approved for treating pediatric acute mania was denied.

c. In May 2008, the Geodon national sales force was directed to "begin calling on immediately" the approved child and adolescent psychiatrist list to promote Geodon. **Exhibit 22**.

d. In August 2009, District Manager Jon Tidwell directed his reps to set up speaker tours for child psychiatrist Stephen Huk.

e. On September 15, 2009, Vice President of Psychiatry Division Amy Jenner praised Dr. Huk at a district dinner meeting in Kansas City for "how he uses Geodon with no limits." Dr. Huk was paid $34,795 by Pfizer in the last half of 2009 for speaker fees.

f. On November 4, 2009, the Geodon Disease Management Team sent an email to the national Geodon sales force reporting that the FDA had denied Pfizer's application to add an indication for Geodon's use in children and adolescents. **Exhibit 23**. However, the Disease Management Team directed that Geodon's "pediatric filing status should NOT be discussed" while Pfizer reps continued to promote Geodon to child and adolescent psychiatrists.

g. In December 2009, District Manager Jon Twidell recommended child and adolescent psychiatrist Dr. Rakesh Jain to his reps to promote the use of Geodon in children and adolescents. Dr. Jain was paid $32,415 in the last half of 2009 and over $150,000 during 2009-2010 in speaker fees.

h. As late as April 14, 2011, Vice President of Psychiatry Amy Jenner falsely told reps at a Central Region Psychiatry Division POA meeting that Pfizer was still waiting for the FDA to approve pediatric and adolescent indications for Geodon, knowing that the reps would repeat this false message to child and adolescent psychiatrists to encourage them to prescribe Geodon for their child and adolescent patients. In fact, Pfizer cancelled a study of Geodon in children with : disorder in June 2010.

g. Relator Booker promoted the use of Geodon for children to child psychiatrist Dr. Elly Bhuyan with Regional Manager Don Sanderson between August 2009 and his termination in January 2010. Relator Booker also promoted the use of Geodon for children to child psychiatrists Dr. Robin Parks and Dr. Joan Butcher. All of these psychiatrists had large Medicaid patient populations. Pfizer thereby knowingly caused Dr. Bhuyan, Dr. Parks and Dr. Butcher to submit off-label claims to Medicaid.

h. Pfizer promoted the use of Geodon for children to the following child psychiatrists in the Chicago area: Dr. Walter Pedemonte, 65551 North Avenue, Oak Park IL; Dr. Joseph Pasic, 1633 North Hamlin, Chicago IL; Dr. Timothy Cullinane, 1140 Lake Street, Oak Park IL; Dr. Elizabeth Canelas, 1116 North Kedzie Avenue, Chicago IL; Dr. Lucya Puszkarski, 2233 West Division, Chicago IL; Dr. Joseph Mason, Chicago IL; and Dr. Theodore Handrup, Chicago IL. All of these psychiatrists had been noted by Pfizer

as high writers of Geodon scripts for children and adolescents who were Medicaid recipients. Pfizer thereby knowingly caused these psychiatrists to submit off-label claims to Medicaid.

i. Pfizer specifically attempted to increase its sales of Geodon by targeting child psychiatrists who had high numbers of Medicaid patients. For example, the column titled "Medicaid Pull-Through" on **Exhibit 24** identifies psychiatrists from whom Pfizer was seeking increased Geodon prescriptions for Medicaid patients.

67. Pfizer paid speakers large amounts of money to promote Geodon to psychiatrists specializing in treating children and adolescents while no other Pfizer drugs still under patent had FDA approved indications for children and adolescents:

a. In January 2008, Regional Manager Curt McAllister asked District Manager Cheryl Shaughnessy to use Dr. John Hardy, a child psychiatrist from Pueblo, Colorado, as a promoter for Geodon. After researching Dr. Hardy's specialty and after speaking with Jina Benfatti, a Colorado Pfizer sales representative who called on Dr. Hardy, Relator Booker informed Shaughnessy via email that a majority of Dr. Hardy's patients were children and adolescents and based on that information Pfizer should look for a speaker with adult psychiatry experience. Shaughnessy did not agree with Relator Booker. Relator Booker thereafter refused to use Dr. Hardy as a speaker based on his specialty. **Exhibit 25**. Dr. Hardy is currently a top Pfizer speaker for Geodon and received $14,225 in the second half of 2009 and $27,950 in 2010 for a total of $42,175 from Pfizer for promoting Geodon.

b. In August 2009, District Manager Jon Twidwell directed his sales representatives in St. Louis, including Relator Alex Booker, to create speaker tours in the

St. Louis area featuring child psychiatrist Dr. Stephen Huk. **Exhibit 26**. Relator Booker objected, stating that Dr. Huk was a child psychiatrist and, therefore, would not have much knowledge about Geodon usage in adult patients. Even though Geodon was not indicated for use by children, Twidwell replied to Relator Booker that Dr. Huk wrote many Geodon prescriptions and was comfortable using Geodon differently and in all his patients. In fact, Dr. Huk spoke about Geodon more frequently than any other speaker in Pfizer's South region which included Kansas, Colorado, Texas, Oklahoma, Arkansas, Missouri and Louisiana.

c. On September 15, 2009, Pfizer's VP of the Psychiatry Division, Amy Jenner, and Regional Manager Don Sanderson held a dinner in Kansas City with district sales representatives including Relator Booker. During the dinner, Ms. Jenner said she "was very impressed with Dr. Huk and how he uses Geodon with no limits." After noting that Dr. Huk had told her how he promotes Geodon during his speaking engagements, Ms. Jenner characterized Dr. Huk as "the most impressive Geodon speaker" she had ever met.

d. On October 28, 2009, Relator Booker's alliance partner Kristi Nelson attended a dinner in St. Louis featuring Dr. Huk. Dr. Huk was the speaker at a dinner meeting attended by Dr. Vikrant Mittal, Dr. Franco Sicuro, and Dr. Jordan Balter. Dr. Huk promoted the off-label uses of Geodon at this dinner meeting.

e. In early November 2009, Kristi Nelson told Relator Booker that Dr. Huk had promoted the off-label uses of Geodon at the October 28, 2009, lunch to the Community Counseling Clinic staff which included Dr. Shajitha Nawasz. Ms. Nelson said she noted this off-label promotion issue on a feedback document which went to the

regional manager and then on to the district manager. Relator Booker advised Ms. Nelson to report this to Jon Twidwell, which she did but Twidwell never reported it to the Pfizer compliance department.

f. On November 4, 2009, Dr. Nawasz informed Relator Booker that Dr. Huk had promoted Geodon for several off-label indications, including as an effective agent for children and as an effective agent for improving cognition, and promoted using Geodon at doses higher than Geodon's highest effective dosage of 160 mg (80 mg bid) twice per day. Dr. Nawasz was appalled at Dr. Huk's behavior and said that Pfizer should be ashamed because of the certified letter she received from CEO Jeffrey Kindler regarding Pfizer's $2.3 billion settlement. Dr. Nawaz stated to Relator Booker that she did not want any more Pfizer speakers to come to her office.

h. On November 18, 2009, Dr. Mittal informed Relator Booker that during the October 28, 2009, dinner meeting Dr. Huk had promoted using Geodon for improving cognitive function and had promoted using dosages of Geodon exceeding 160 mgs.

j. In the second half of 2009, Pfizer paid 25 child/adolescent psychiatrists in all of its regions close to $300,000 in speaker fees. Pfizer paid seven child and adolescent psychiatrists in four of its regions over $14,000 each for speaker fees. Four speakers in three regions were paid over $30,000 each.

k. In 2010, Pfizer paid 25 child/adolescent psychiatrists in all of its regions over $600,000 in speaker fees. Pfizer paid nine child and adolescent psychiatrists in five of its regions over $17,000 each in speaker fees. Five speakers in four regions were paid over $49,000 each.

i. In December 2009, Dr. Rakesh Jain, a child and adolescent psychiatrist from Texas, was one of the most sought after Geodon speakers for Pfizer. Kelly Huffman, sales representative from Relator Booker's St. Louis district, had been asked by District Manager Jon Twidwell to book Dr. Jain for several promotional talks in the St. Louis area. Huffman emailed Relator Booker and other district members informing them that Dr. Jain had been booked for the St. Louis tour. **Exhibit 27.** Relator Booker did not agree with booking Dr. Jain as a speaker because Dr. Jain promoted using Geodon in children and adolescents. In the second half of 2009, Dr. Jain was paid $28,785 by Pfizer and an additional $118,971 for 2010 totaling $151,386.

68. Pfizer promoted Geodon off-label by concealing material evidence against Geodon's safety when used by children and adolescents:

a. "Intentionally suppress[ing] material negative information" about a drug's safety or efficacy when used for an off-label purpose renders the manufacturer's "positive statements about [the safety and] efficacy in treating those conditions misleading, and factually false." *In re Neurontin Marketing and Sales Practices Litigation,* 748 F.Supp.2d 34, 82-83 (D.Mass. 2010).

b. As the Department of Justice pronounced in the Statement of Interest it filed in the *Polansky* case, "a statement urging a physician to prescribe a drug for an unapproved use could well amount to a half-truth and satisfy the false statement requirement of section (a)(2), where, for example, the drug sales representative fails to mention evidence that does not support the drug's safety or efficacy for the unapproved use or that the FDA has specifically denied approval for that indication." *United States ex rel. Polansky v. Pfizer, Inc.,* Case No. 04-cv-0704(ERK)(ALC) (E.D.N.Y.).

c. On June 9, 2009, the FDA's Psychopharmacologic Drugs Advisory Committee voted on the safety and efficacy of Geodon for the pediatric population in response to Pfizer's application for a new Geodon pediatric indication. A majority of the committee refused to agree that Geodon had been shown to be acceptably safe for the treatment of mania in pediatric patients ages 10 to 17. Pfizer, however, chose not to advise its Geodon sales force of this critical fact while its sales reps were promoting Geodon to child and adolescent psychiatrists.

d. After the FDA formally rejected Pfizer's application for a general pediatric indication for Geodon at the end of October 2009, Pfizer management sent the November 4, 2009 email to its Geodon sales force to ensure that no Pfizer rep advised physicians of the FDA's rejection of the pediatric indication Pfizer sought or of the safety concerns that underlay the FDA's rejection.

e. Pfizer thus concealed from physicians both the FDA's vote against Geodon's safety for children and adolescents and the FDA's later formal rejection of Pfizer's application for a general pediatric indication for Geodon, while at the same time promoting Geodon to child and adolescent psychiatrists.

f. On March 24, 2009 Ida-Lina Diak (FDA) issued a report designed as a comparison to Pfizer submitted data discussing a series of deaths and suicides among children and adolescents taking Geodon. **Exhibit 28**.

g. On April 17, 2009, Yeh-Fong Chen (FDA) issued a report providing an overview of Geodon's safety profile for the pediatric population with a particular focus on deaths, suicide-related events and QT related events. **Exhibit 29**. All but one of the 24 cases involved serious and life threatening adverse events.

h. On April 24, 2009, Mark Ritter (FDA) noted that his studies concluded that the pediatric population was of particular concern to him because of its greater risk for QT prolongation related adverse events when using Geodon. **Exhibit 30**. Pfizer had submitted a scatter plot diagram to support its claim that these results were no different for children and adolescents than for adults. Dr. Ritter made Pfizer perform a regression analysis of the diagram and the results proved that Pfizer's contention was false. Three of Pfizer's researchers (Drs. Sohail S. Punjwani, Adly Thebaud, and Steven Lopez) also incorrectly dosed 10 pediatric study patients with medication that exceeded the maximum allowable dose in the protocol.

i. On October 14, 2009, Allen Brinker (FDA) issued a report confirming that children treated with Geodon were much more likely to experience adverse effects than adults. **Exhibit 31**.

j. On December 8, 2009, the FDA's Pediatric Advisory Committee discussed the safety issues of Geodon and noted that most Geodon sales are off-label and lack sufficient evidence for either benefit or safety. **Exhibit 32**.

k. The December 8, 2009 meeting was bracketed by a series of FDA warning letters sent to three doctors (Drs. Thomas Gazda, Sohail Punjwani and Timothy Summers) performing Pfizer trial studies for Geodon in the pediatric segment. **Exhibits 33, 34 and 35**. These warnings cited numerous problems and various improprieties including dosing and making changes to research without approval.

l. On April 9, 2010, Leslie K. Ball (FDA) issued a warning letter to Pfizer concerning Geodon's clinical investigations noting that the various afflictions, overdosing, improper monitoring, failure to adhere to protocols and failure to keep

investigators informed of errors were repeat violations that the FDA cited Pfizer for in 2005. **Exhibit 36.**

m. However, Pfizer never informed its sales force, specifically including Relator Booker, of any of the safety problems identified by the FDA resulting from children and adolescents using Geodon.

n. Pfizer also never informed its sales force that the FDA Advisory Committee had rejected Pfizer's claim that Geodon had been shown to be acceptably safe for the treatment of : mania in pediatric patients.

69. In March 2011, a 10-year old Medicaid recipient was transported by ambulance to a hospital in Belleville, Illinois with chest pains. This 71 pound child was taking Geodon prescribed by Dr. Ashok Yanamadala, a pediatric and adolescent psychiatrist in Granite City, Illinois. Relator Hebron promoted Geodon to Dr. Yanamadala for use in children when he worked at Pfizer in 2005. Other Pfizer sales representatives have continued to promote Geodon to Dr. Yanamadala for off-label purposes up through the present date without disclosing the numerous safety problems identified by the FDA. This child also was prescribed Geodon in April 2011 by Dr. Karl Gunderson after Dr. Gunderson had been promoted by Pfizer to use Geodon in children without the numerous safety problems identified by the FDA being disclosed..

## C. Pfizer Promoted Off-label Dosing of Geodon

70. Pfizer promoted off-label dosing of Geodon:

a. The Geodon package insert states that the initial daily dose for treatment of schizophrenia should be 20 mg twice a day and that "patients should ordinarily be observed for improvement for several weeks before upward dosage adjustment."

b. In clear disregard of the package insert and patient safety, the Geodon Disease Management Team directed reps to tell physicians that they needed to get their schizophrenia patients to a dosage of 120-160 mg of Geodon within a week of starting.

c. The reason reps told this to doctors was because patients and doctors reported that Geodon seemed ineffective at low doses. When it took three weeks for patients to get to the 120-160 mg dosage, then some patients and doctors would discontinue Geodon and representatives would lose those sales.

d. Representatives were taught at Pfizer that Geodon's D2 (dopamine) blockade kicks in at 120 mg a day and higher. At doses under 120 mg a day, Geodon is thought to be an SNRI (serotonin norepinephrine reuptake inhibitor) with very little or no D2 blockade. The antipsychotic and antimanic effect is thought to be caused by an antipsychotics' blockade of D2 receptors in the brain. Therefore, doses under 120 mg a day theoretically might not work for schizophrenia or mania for most patients.

e. Yet titrating the dose of Geodon more quickly for schizophrenia was outside of the FDA approved package insert. It was not FDA approved and it was not based on evidence-based medicine.

f. Geodon is approved by the FDA for daily doses up to 160 mg for treating schizophrenia, acute treatment of manic/mixed episodes of : I disorder, and maintenance treatment of : disorder as an adjunct to lithium or valporate, and up to 40 mg a day for intramuscular administration for acute treatment of agitation associated with schizophrenia.

g. However, Pfizer sales representatives told physicians with large numbers of Medicaid patients that Illinois Medicaid would pay for up to 240 mg of Geodon per

day and Texas Medicaid would pay for up to 360 mg per day as a means to encourage physicians to increase the dosage of their Geodon prescriptions. Once again there is silence with respect to the safety issues regarding dosages of this magnitude and a total disregard for patient safety.

h. Sales representatives were motivated to do this because a dose of over 160 mg per day could count as the equivalent of two scripts for purposes of meeting representatives' monthly sales quotas and earning bonuses.

**D. <u>Pfizer Promoted Geodon By Making False Statements About Geodon's Side Effects</u>**

71. Pfizer promoted Geodon by making false statements about Geodon's side effects:

a. Pfizer had a policy before the 2009 settlement and continuing to this day of downplaying the side effects of Geodon when dealing with physicians. The policy was needed because physicians were complaining that Geodon is unpredictable and this was a negative for increasing scripts and a problem the sales representatives needed to fix. Some patients would get "activated" or anxious after starting on Geodon, while others would get very sedated. Moreover, there was no way to predict which patients would get which of these side effects. In order to counteract these problems, Pfizer created and implemented a program of "Managing Side Effects."

b. Pfizer sales representatives were trained on how to manage the side effects of Geodon at POA meetings by district managers and specifically how to respond to physicians complaining about their patients becoming either anxious or sedated after starting on Geodon so that these physicians would continue those patients on Geodon and would continue to prescribe Geodon in the future. The sales representatives were

instructed to tell physicians that if a patient was sedated that meant that Geodon was working too well and the physician either had to lower the dose or tell the patient to wait for at least a week for the sedation to go away. On the other hand, if a patient got activated or anxious on Geodon, then representatives were told to tell the doctor that the physician was underdosing the drug and that the patient had to have an increase of the dosage of Geodon. The sales representatives lacked any clinical data to support these factual assertions they made to physicians in efforts to retain and promote Geodon sales.

c. Pfizer's sales representatives told physicians that Geodon's incidence of EPS (extrapyramidal syndrome or involuntary movements) and Akathisia (feeling like you are crawling out of your skin) was equal to that of placebo. In fact, this inference is contained in some of the iCUE slides. However, prescribing doctors informed Pfizer sales representatives that Geodon did in fact cause a significant amount of EPS and Akathisia in their patients.

d. This false statement may have or could have led to serious patient harm because EPS can lead to tardive dyskinesia, which is a very often irreversible and severely disabling disorder which can occur in patients who take antipsychotics.

## PFIZER REPEATEDLY PROMOTED PRISTIQ OFF-LABEL IN MULTIPLE WAYS FROM 2008 TO THE PRESENT.

### A. Distribution of Pristiq Samples and Pristiq Promotional Materials to Pain Management Physicians:

72. Pfizer promoted Pristiq off-label as a treatment for pain. Pristiq (devsvenlafaxine) is an SNRI or serotonin-norepinephrine reuptake inhibitor. The FDA has approved Pristiq only for the treatment of major depressive disorder in adults. **Exhibit 37** (Pristiq brochure). The recommended dosage is 50 mg per day. Pristiq was

the primary drug acquired by Pfizer in its October 2009, acquisition of Wyeth Pharmaceuticals.

73. Pristiq was tested in two clinical studies to determine if it could reduce pain in joints. However, Pristiq never received approval from the FDA to treat any kind of pain, including fibromyalgia pain.

74. Pfizer has been and is knowingly promoting Pristiq for off-label treatment of pain by directing its sales representatives from 2009 through the present to distribute samples of Pristiq and Pristiq promotional materials to pain management physicians as part of a national strategy to promote the off-label use of Pristiq for pain management and control.

75. As shown in the chart below, Relators Alex Booker and Eddie Hebron visited the offices of pain management doctors in six states (Missouri, Kentucky, Tennessee, Illinois, Indiana, and Ohio) in two of Pfizer's regions (South and Central) in order to determine that Pfizer is marketing Pristiq off-label to pain management doctors:

| Physician | Office | Office address | Website | Results |
|---|---|---|---|---|
| Edwin D. Dunteman, M.D., M.S. | A&A Pain Institute of St. Louis | 555 North New Ballas, Suite 165 St. Louis, MO 63141 | www.aapaint.net | Pristiq samples were in the drug closet |
| T.Z. Chen, M.D., M.P.H. | Greater St. Louis Pain Management | 11716 Studt Avenue St. Louis, MO 63141 | | Pristiq samples were in the drug closet |
| Gurpreet S. Padda, M.D. | Padda Institute | 5203 Chippewa Street Suite 301 St. Louis, MO | www.paddainstitute.com | Pharmacist in same office building said Dr. Padda |

| | | | | |
|---|---|---|---|---|
| | | 63109 | | prescribed Pristiq (office staff was not available to answer questions about Pristiq samples). |
| Hafiz Khattak, M.D. | Rehabilitation and Pain Management | 140 East Lockwood, Webster Groves, Missouri 63119 | www.gatewayhealthcare.net | Prestiq samples were in the drug closet |
| Shane Fancher, M.D. | | 1800 East Lake Shore Drive Decatur, Illinois 62521 | | Pristiq promotional material displayed in the office waiting room (office staff was not available to answer questions about Pristiq samples) |
| Steven A. Rupert, D.O. | Medical Center for Pain Relief | 2330 Lynch Road, Ste 100 Evansville, IN 47711 | | Pristiq samples were in the drug closet |
| James Patrick Murphy, M.D. | Murphy Pain Center | 3020 Eastpoint Parkway, Louisville, KY | | Pristiq promotional material displayed in the office waiting room (Photo is attached as **Exhibit 38**) (office staff was not available to answer |

| | | | | |
|---|---|---|---|---|
| | | | | questions about Pristiq samples) |
| Mitchell E. Simons, M.D. | Pain Management Centers | 4243 Hunt Road, Cincinnati, Ohio 45242 | | Pristiq samples were in the drug closet |
| J. Pervis Milnor III, M.D. | | 920 Estate Drive, Suite 8, Memphis, Tennessee 38119 | | Pristiq samples were in the drug closet |
| Chris Kasser, M.D. | | 320 Walnut Bend South, Suite 5 Cordova, Tennessee 38018 | | Pristiq samples were in the drug closet |

76. Several of the pain management physicians whose offices were visited by Relators also have pain management clinics in other states. Based on what Relators found in their visits to the offices listed above, Relators believe that Pfizer sales representatives likely also promoted Pristiq in these additional offices:

| | | |
|---|---|---|
| Gurpreet S. Padda, M.D. | Padda Institute<br>505 Buckeye, Suite 201,<br>Troy, Illinois 62294 | www.paddainstitute.com |
| Mitchell E. Simons, M.D. | Pain Management Centers<br>Suite 2C, 20 North Grand Avenue<br>Fort Thomas, Kentucky 41075 | |
| Mitchell E. Simons, M.D. | Pain Management Centers<br>7380 Turfway Road<br>Florence, Kentucky 41042 | |

Hafiz Khattak, M.D. Rehabilitation and Pain Management
8601 West Main Street, Suite 101
Belleville, Illinois 62223

77. A copy of the back of Dr. Rupert's business card is attached as **Exhibit 39**. This card shows graphically what services these pain management physicians typically perform. They do not treat major depressive disorder, yet Pfizer is promoting Pristiq to them. Clearly, this is so that pain management physicians will prescribe Prestiq for the off-label purpose of pain relief. When pain management physicians are being marketed for Pristiq in six states in both the Midwest and the South, clearly this is being done by Pfizer as part of a national strategy.

78. During the Pristiq launch meetings in October-November 2009, the Pristiq Disease Management Team held a workshop on the Liebowitz clinical study that focused on Pristiq 100 mg dosage improving pain overall, stomach pain, back pain, chest pain, arm pain, leg pain and joint pain, as detailed on pages 1882-1884 of that study. **Exhibit 40**. The message was that depression hurts all over the body, that patients with constant pain will become depressed and that Pristiq can help these patients.

79. Following these Pristiq launch meetings, Pfizer sent the Liebowitz clinical study to all Pristiq reps.

80. On December 4, 2009, District Manager Jon Twidwell visited physicians with Relator Booker. During these visits, Mr. Booker quoted data from the Liebowitz study showing that Pristiq improved pain all over and Twidwell never objected.

81. On December 14, 2009, Regional Manager Don Sanderson visited physicians with Relator Booker. During these visits, Mr. Booker quoted data from the

Liebowitz study showing that Pristiq improved pain all over and Sanderson never objected.

82. Relator Eddie Hebron was told recently by a former office manager named Kevin Jackson that Pfizer promoted Pristiq for pain relief to spine specialists at Southern Illinois Orthopedic Associates in Herron, Illinois, which Kevin Jackson used to manage. Kevin Jackson also said Pfizer promoted Pristiq for pain relief to hand, foot and ankle specialists at the Orthopedic Institute of Western Kentucky in Paducah, Kentucky.

83. Relator Hebron observed a pattern of off-label prescriptions of Pristiq in 2012 in Flagstaff, Arizona; Albuquerque, New Mexico; Amarillo, Texas; and Dallas, Texas. In each city, pharmacists in chain pharmacies told Relator Hebron that they have seen Pristiq prescribed to treat pain, specifically neurologic or nerve pain and fibromyalgia pain.

84 The FDA should be concerned about Pfizer's off-label promotion of Pristiq for pain relief for several reasons. First, in order to be effective for pain relief, Pristiq would have to be prescribed at dosages of 100 mg or higher. But, as Relator Booker's handwritten notes from his Pristiq launch training state, "A.E. [adverse events] more frequent above 50 mg", including increased risk of high blood pressure. **Exhibit 41.** Second, as the FDA noted in August 2008, Pristiq's "clinical trials highlight a potential for serious liver injury." Given that serious risk to a life-sustaining organ no off-label promotion should be tolerated by the FDA (or by the Department of Justice either). **Exhibit 42.**

**B. Pfizer promoted the 100 mg off-label dosage of Pristiq:**

85. Although Pfizer manufactures Pristiq in both a 50 mg dose and a 100 mg dose, only the 50 mg dose has been approved by the FDA.

86. At multiple national sales meetings in October and November 2009, Vice President of Psychiatry Amy Jenner introduced Pristiq to Pfizer's national sales force. Ms. Jenner presented a clinical study by Michael Liebowitz which showed that Pristiq has some efficacy for treating pain at the 100 mg dose. **Exhibit 40**.

87. At multiple Pristiq launch meetings in October-November 2009, the Pristiq Disease Management Team presented the Boyer clinical study in detail. **Exhibit 43**. The Boyer study promoted off-label use of the 100mg dosage by concluding (A) that "[b]oth doses of desvenlafaxine were generally well tolerated", and (B) that "[f]ixed doses of desvenlafaxine 50 and 100 mg/day are safe, generally well tolerated, and effective at a clinically relevant level for the treatment of MDD." The Disease Management Team presented every page of the Boyer clinical study, pointed out the safety and efficacy of the 100 mg dose, and told reps that they could sell Pristiq at the 100 mg dosage.

88. The Pristiq Participant's Workbook distributed during the national launch meetings included the Boyer and Liebowitz clinical studies. **Exhibit 44**. The "objective" of this training was described this way: "the goal of this workshop is to ensure that you understand the recent key clinical studies on the efficacy and safety of Pristiq. Key clinical studies include: Boyer et al, Liebowitz et al." Item 1 of the workshop instructions was "Listen to an overview of the Clinical Development Program for Pristiq, focusing on the Boyer et al trial." Item 2 directed participants to "work in small teams (2

to 3 people) to answer the questions on the worksheet in your Participant's Workbook for Boyer et al." Item 3 was "Listen to an overview of the Liebowitz et al trial." Item 4 directed participants to "work in small teams (2 to 3 people) to answer the questions on the worksheet in your Participant's Workbook for Liebowitz et al."

89. During the selling workshops held at the Pristiq launch meetings, Pfizer trainers showed reps how to dose Pristiq at 50 mg for a week and then titrate to 100 mg.

90. After the national Pristiq sales launch, the Pristiq Disease Management Team mailed the Liebowitz clinical study and the Boyer clinical study to all Pristiq reps.

91. In its Pristiq marketing brochure titled "Helping patients with MDD toward their treatment goals", Pfizer promoted "one long-term PRISTIQ study" in which patients took Pristiq "at 4-8 times the recommended 50-mg dose." **Exhibit 45**.

92. Accordingly, Pfizer reps promoted the 100 mg dosage to physicians around the country. That is why 40-50 percent of all Pristiq sales were for the unapproved 100 milligram dosage.

93. Relator Booker promoted Pristiq at the 100 mg dose. In fact, Relator Booker promoted Pristiq 100 mg on December 4, 2009 with District Manager Jon Twidell present and again on December 14, 2009 with Regional Manager Don Sanderson present and neither manager objected.

94. District Manager Stephanie Bartels knew that her reps in Chicago promoted Pristiq 100mg and told her reps that it was fine to promote Pristiq 100 mg.

95. Pfizer management was aware of the volume of Pristiq 100 mg sales because sales of Pristiq 50 mg and Pristiq 100 mg were tracked separately.

96. Pfizer district managers and regional managers promoted Pristiq 100 mg sales by telling reps that they would receive more sales credits for selling 100 mg doses than for selling 50 mg doses.

97. The fact that almost half of all Pristiq sales were for the unapproved 100 mg dose in spite of the fact that both the Pristiq label and the Pristiq marketing brochures describe the 50 mg dose as the "one size fits all" dosage demonstrates that Pfizer reps must have promoted the 100 mg dose.

98. If there is no "spike" in the number of 100 mg dosages during the 2009-2010 period, that is because Pfizer merely continued Wyeth's practice of promoting the 100 mg dosage after Pfizer purchased Wyeth in the fall of 2009.

99. After Pfizer acquired Wyeth, Pfizer continued manufacturing Pristiq in the 100 mg dosage because it hoped that Pristiq would obtain FDA approval for treatment of menopause symptoms, which would have required a 100 mg dosage. At the same time, however, Pfizer promoted the 100 mg dosage of Pristiq for other purposes while it awaited FDA's approval of the menopause indication, which never occurred.

100. The FDA should be concerned about Pfizer's off-label promotion of Pristiq 100 mg because the incidence of adverse events is higher for Pristiq 100 mg than for Pristiq 50 mg. As Relator Booker's handwritten notes from his Pristiq launch training state, "A.E. [adverse events] more frequent above 50 mg." **Exhibit 41**

101. Relator Booker promoted Pristiq 100 mg to Dr. Mirza, Dr. Gunawardhana, Dr. Nawaz, and Dr. Balter. All of these psychiatrists had large Medicaid patient populations. Pfizer thereby knowingly caused Dr. Mirza, Dr. Gunawardhana, Dr. Nawaz, and Dr. Balter to submit off-label claims to Medicaid.

C. **Pfizer promoted Pristiq off-label by concealing material side effects risks from physicians:**

102. Pfizer knew that the side effects of Pristiq, including elevated blood pressure, increased dramatically at doses greater than 50 mg. Pfizer knew this because it had promoted Zoloft for many years against Effexor, the predecessor to Pristiq, by pointing out Effexor's blood pressure risks to physicians. Yet Pfizer never directed its Pristiq sales force to mention any of these substantially increased side effects to physicians, despite the fact that former Wyeth employees familiar with Effexor did much of the Pristiq launch training for Pfizer reps. In particular, neither the St. Louis or Chicago district directors nor the South or Central regional managers said anything to Relator Booker about the relative safety of Pristiq 100 mg.

103. Pfizer promoted Pristiq as having a discontinuation rate equal to that of a placebo based on the approved 50 mg dose. But Pfizer knew that approximately half of its Pristiq sales were at the off-label 100 mg dose which had a higher discontinuation rate.

104. Chicago District Manager Stephanie Bartels attempted to expand the Pristiq market in August 2010 through depression screenings conducted on heart attack patients at Illinois Masonic Hospital without advising those patients or their physicians that Pristiq at the 100 mg dosage has been clearly shown to increase blood pressure. **Exhibit 46.**

105. Discontinuation or withdrawal syndrome is a very well known side effect of Effexor and Effexor XR. It is also noted in the Pristiq package insert that Pristiq can cause discontinuation syndrome. However, at Pristiq initial training and at POA meetings there was no talk of this side effect. While using iCUE, representatives were never instructed to talk about or warn doctors of the possibility of discontinuation

syndrome with Pristiq. The fact is that Pristiq does cause discontinuation syndrome but the representatives were purposely not informed of the seriousness of this issue.

106. Discontinuation syndrome causes very strong side effects such as dizziness, headache, severe irritability, nausea, electrical impulse shooting pains in the arms and/or or head, flu-like symptoms, insomnia, etc., that make it very difficult for patients when they try to stop taking a drug or even if they miss a dose for a day or two. Many doctors complain that they cannot get people off of drugs that cause discontinuation syndrome.

107. In summary, the reason that Pfizer's concealment of these material side effects risks is so serious is that blood pressure elevation and discontinuation syndrome were the two biggest side effects of venlafaxine (Effexor and Effexor XR) which Pfizer's Zoloft sales representatives spent years warning doctors about (using Pfizer compare and win sales presentations) when venlafaxine was their rival. However, after Pfizer purchased Wyeth and in effect acquired desvenlafaxine (Pristiq), those same two side effects are now virtually never mentioned to doctors regarding Pristiq.

**D. Pfizer promoted Pristiq off-label for menopause or vasomotor symptoms:**

108. In June 2006, Wyeth submitted an application to the FDA to obtain an indication for Pristiq for moderate to severe vasomotor symptoms associated with menopause. However, in April 2007, the FDA rejected this application "based on a lack of substantial evidence of efficacy and insufficient information to determine if Pristiq was safe for use under the conditions suggested in the proposed labeling." The "major safety issues" identified by the FDA were "cardiac ischemia and liver toxicity."

109. After purchasing Wyeth in 2009, Pfizer chose to continue to promote Pristiq off-label for vasomotor symptoms in the hope that the FDA would eventually

approve that indication. As part of that effort, Wyeth, now owned by Pfizer, became both a platinum partner for the North American Menopause Society's Annual Meeting and Tribute Reception and a platinum level contributor to the Society's Consumer Event and Gala in 2010.

110. In addition, Pfizer sponsored articles promoting the use of Pristiq for treating menopause symptoms. For example, Pfizer sponsored "Desvenlafaxine: A Therapeutic Option for Treatment of Menopausal Hot Flashes" written by Dr. David Fitzgerald Archer and published in May 2010, as well as "Desvenlafaxine and Escitalopram for the Treatment of Postmenopausal Women with Major Depressive Disorder" written in part by Dr. Susan G. Kornstein and published in July 2010. In 2010, Pfizer paid Dr. David Fitzgerald Archer $27,682 and paid Dr. Susan G. Kornstein $14,822.

111. In May 2011, Pfizer presented data from a Phase 3 efficacy sub-study on Pristiq's effectiveness in reducing hot flashes in menopausal women to the annual clinical meeting of the American College of Obstetricians and Gynecologists.

112. By its actions, Pfizer created a market for the off-label prescription of Pristiq for treatment of menopause symptoms. *Strom ex rel. United States v. Scios, Inc.*, 676 F.Supp.2d 884, 891 (N.D. Cal. 2009) ("In sum, the Government alleges that Defendants' marketing activities created the market for the outpatient use of Natrecor").

113. In 2012, Relator Hebron found a Kroger's pharmacy in Dallas, Texas filling off-label prescriptions of Pristiq for menopause and hot flash indications.

**ANTI-KICKBACK ACT VIOLATIONS**

114. Pfizer created an expanded promotional speaker program which violated the Anti-Kickback Act, 42 U.S.C. § 1320a-7b, by inducing speakers to write more Geodon and Pristiq scripts:

a. Immediately following the settlement agreement process in the fall of 2009, Pfizer set about revamping the former Geodon Speakers Bureau program into an agency based promotional physician pay-off program that by mid-2010 had just about quadrupled the number of retained physicians serving as Pfizer paid advocates since 2009.

b. In early to mid-2010, each Pfizer Psychiatry Division sales territory (which consisted of one or two representatives per territory) was directed to choose two to three physicians to join Pfizer's new Promotional Speakers Program. District Manager Stephanie Bartels, like other district managers, encouraged her representatives to select those physicians who had the highest potential to write Geodon and Pristiq scripts to be trained to become Pfizer speakers. Pfizer's regional managers were aware of this policy, which remains in effect today. District managers would provide more speaker money to representatives who had physicians with the largest potential to write scripts. Representatives, in turn, clamored for more speaker money so that they could motivate high-potential doctors to write more scripts.

c. Many physicians selected to become Pfizer speakers were unsuited to this role, either because they had poor communication skills or lacked any academic affiliations which might enable them to persuade other physicians. Regional Manager Jack Shoemaker even told District Manager Stephanie Bartels after he attended one of

Pfizer's speaker training sessions that he was not overly impressed by the quality of the speakers selected.

d. A physician's speaking engagement was eligible for payment as long as at least two health care professionals attended in addition to the speaker. These health care professionals could include individuals who lacked the ability to write Geodon or Pristiq scripts, such as nurses, social workers and pharmacists. That was because Pfizer's focus was solely on motivating speakers, rather than attendees, to write more Geodon and Pristiq scripts. Following the September 2009 settlement, Pfizer began the weekly tracking of scripts issued by both its speakers and by physicians who attended Pfizer speaking engagements. According to District Manager Stephanie Bartels and Regional Manager Jack Shoemaker, Pfizer knew for a long time that the number of scripts issued by speakers increased dramatically, but the number of scripts issued by physicians who merely attended a Pfizer speaking event did not increase much.

e. Physicians chosen to become Pfizer speakers were first required to sign a promotional contract. Then they were paid to attend weekend speaker training sessions in Dallas, Texas and Hollywood, Florida. After being trained, these physicians earned between $1000-$1750 per hour for speaking engagements, subject only to a $50,000 annual cap which could be increased in certain situations. In 2010, the number of physicians trained to become Pfizer speakers increased dramatically as stated. During the POA meetings and other training opportunities, Pfizer representatives were instructed by district managers to train their speakers as "Pfizer advocates" and to encourage the speakers to conduct themselves in such a manner.

f. In effect and in law, the speakers had become agents of Pfizer and as such were constrained by the same types of things as Pfizer in so much as they should not have been allowed to promote or even suggest use of the two drugs in an off-label manner and were certainly under the same duty to advise of negative safety and health issues related to the drugs and of any FDA ruling relative to disapproved indications. Yet the speakers still discussed off-label uses if prompted by questions from attendees and rarely if ever made sufficient and precise mention of the large number of safety issues present in both drugs.

g. All in all, the net result of the institution of the new Promotional Speakers Program was to convert the speaker into a paid advocate and agent of Pfizer and the result of that was the speaker spiked his scripts. In reality there was no characterization of independence left in the speaker physician and while he was in front of the podium, he was in all regards a Pfizer spokesperson.

h. Representatives sometimes placed an attendee at a speaking engagement as a "plant" by instructing that person to ask the speaker a question about a potential off-label use of the drug being discussed. Although the use of plants diminished somewhat after the September 2009 settlement, it never ended.

**<u>POST-SETTLEMENT DIRECTIONS TO SELL GEODON AND PRISTIQ "THE OLD WAY"</u>**

115. Pfizer managers directed their sales representatives to sell Geodon and Pristiq by whatever means necessary, including "the old ways" of off-label promotion:

a. In February 2010, District Manager Stephanie Bartels directed her sales representatives to "do whatever it takes" to sell Geodon and Pristiq and to "go back to the old ways." She also threatened her sales representatives with being put on a path to

termination if they did not raise sales by all available means. She told them to figure out a way to "get it done and get it done quickly." She mentioned that these threats had come to her through Regional Manager Jack Shoemaker.

b. Ms. Bartels told multiple sales representatives that they "could be put on a performance plan", which usually leads to termination, if they did not raise their sales of Geodon and Pristiq by all available means. She said "you've got to figure out a way to get it done and you have to get it done quickly because the Regional Manager has you under the microscope." Ms. Bartels did so after she was threatened by Regional Manager Jack Shoemaker with being put on a performance plan herself.

c. Recently District Manager Stephanie Bartels directed her sales representatives to approach all of their doctor "friends" and tell them to step up their Geodon and Pristiq prescribing because their jobs depended on it.

d. Sales representatives received warnings against "compare and win" by corporate compliance officials attending POA meetings, but then the same sales representatives were told by their district managers to "sell the old way" and were provided a "compare and win" work sheet. Stephanie Bartels told sales representatives that she was particularly impressed with a new sales representative because of his effectiveness in sales achievement with his compare and win methods. Similarly, District Manager Jon Twidell told sales reps to use "compare and win" tactics by comparing data in the Citrome clinical study on patients' hostility after taking Geodon versus their hostility after taking Abilify. **Exhibit 4.**

e. Pfizer management undermined the iCUE program by (A) instructing their sales representatives to stop relying on iCUE so much and (B) warning the

representatives against recording anything in the Notes section of the iCUE program, which could possibly be construed as off-label promotion.

f. Corporate officials warned sales reps to be very careful what that representative recorded in the notes section of the ICUE or the representative could go to jail. Bartels directed her representatives not to put anything in the notes section including what was actually said to physicians in sales conversations.

**PFIZER'S VIOLATIONS OF ITS CORPORATE INTEGRITY AGREEMENT AS REVERSE FALSE CLAIMS**

116. On August 31, 2009, Pfizer and the Office of Inspector General of the United States Department of Health and Human Services entered into a Corporate Integrity Agreement contemporaneously with Pfizer's $2.3 billion settlement with the Department of Justice. **Exhibit 47.**

117. Section III(J)(2) of the Corporate Integrity Agreement requires that "Pfizer shall notify OIG, in writing, within 30 days after making the determination that [a] Reportable Event exists." Section III(J)(1) defines a "Reportable Event" as including "a. a matter that a reasonable person would consider a probable violation of criminal , civil or administrative laws applicable to any Federal health care program for which penalties or exclusion may be authorized" and "b. a matter that a reasonable person would consider a probable violation of criminal, civil, or administrative laws applicable to any FDA requirements relating to the promotion of Government Reimbursed Products."

118. Section V(B)(19) of the Corporate Integrity Agreement requires that Pfizer submit an Annual Report to the Office of Inspector General which "shall include ... a summary of Reportable Events (as defined in Section III.J) identified during the

Reporting Period and the status of any corrective and preventative action relating to all such Reportable Events."

119. Section X(A)(I)(o) of the Corporate Integrity Agreement imposes a "Stipulated Penalty" of $2,500 per day "for each day Pfizer fails to ... accomplish ... the reporting of any Reportable Event."

120. Relator Booker's January 5, 2010 email to Pfizer Corporate Compliance, attached as **Exhibit 48**, objecting to off-label Geodon sales practices constituted a Reportable Event under both Section III(J)(1)(a) and (b) of Pfizer's Corporate Integrity Agreement.

121. Contrary to its contractual obligations under Section III(J)(2) and Section V(B)(19) of its Corporate Integrity Agreement, Pfizer failed to report the allegations contained in Relator Booker's January 5, 2010 email to Pfizer Corporate Compliance to the Office of Inspector General in order to conceal, avoid, or decrease its contractual obligation to pay the required per day Stipulated Penalty.

122. On the surface, Pfizer cleaned up its act following the $2.3 billion settlement by requiring use of the ICUE sales tool and by having corporate compliance officials visit national and regional POA meetings to preach zero tolerance for compliance violations and to warn against prohibited sales practices such as "compare and win." Below the surface, however, Pfizer's regional managers and district managers forced their sales representatives to "sell the old way" by using prohibited practices.

123. A good example of the stark contrast between the surface veneer of compliance preached by Pfizer's corporate headquarters and the reality experienced by Pfizer's sales representatives concerns what representatives were instructed to record in

the "Notes" section of the ICUE program following their sales calls. Despite the fact that the ICUE program apparently is being promoted to the Government as a means of ensuring that Pfizer representatives did not sell off-label, both corporate officials and managers warned sales reps against recording anything in the Notes section which could be construed as off-label promotion.

124. Specifically, corporate officials warned a Chicago sales representative to be very careful what that representative recorded in the Notes section or the representative could go to jail. This was followed by Central Region Manager Jack Schumaker and other company officials telling the Chicago representatives to be very careful about what they put in the Notes section because those entries would be looked at closely and anything that looked possibly out of compliance could get the sales representatives and Pfizer in trouble. Immediately following that, District Manager Stephanie Bartels directly instructed her representatives not to put anything in the Notes section.[1]

125. The truth is that the ICUE program is not an effective compliance tool at all. When district managers needed to raise their sales they simply instructed their representatives to stop relying on the ICUE program as much and go back to selling "the old way". Moreover, multiple levels of Pfizer management instructed sales representatives to avoid recording in the ICUE program what was actually said to physicians in sales conversations.

126. At a regional POA meeting in Atlanta in late 2009, a corporate compliance official told the sales representatives, district managers and regional

[1] Beyond the warning about notes, Mr. Schumaker and Ms. Bartels also advised Chicago representatives to be very careful about the emails they sent as well. Ms. Bartels told her representatives "Don't you notice how Jack doesn't say anything in his emails anymore?"

managers in attendance that all of Pfizer's compliance problems which caused the $2.3 billion settlement were the fault of the sales representatives.

127. Yet Pfizer's regional managers and district managers did not reinforce this compliance message. Rather, they threatened the jobs of their sales representatives as a means of promoting sales without at the same time warning against off-label promotion. In addition, they deemphasized the importance of the narrowly focused ICUE digital slide system and directed that their representatives return to the old broadbrush way of selling which included off-label promotion.

**RELATOR BOOKER'S LAWFUL ACTIONS TO STOP PFIZER'S FALSE CLAIMS AT VIOLATIONS**

128. In August 2009, Relator Booker and Twidwell made a sales call on child psychiatrist Dr. Ellen Bhuyan during which Dr. Bhuyan asked about long-term data on Geodon's use in bi-polar patients. Relator Booker replied that Geodon did not have an indication for bi-polar maintenance and that Pfizer did not have data that he could give her. After the sales call was over, Twidwell told Relator Booker to request a medical inquiry for Dr. Bhuyan showing Geodon's use for bi-polar maintenance. Relator Booker objected because Geodon was not indicated for bi-polar maintenance.

129. In September 2009, Relator Booker presented data on Geodon's use for bi-polar mania and mixed episodes to adult psychiatrist Dr. Radhika Rao with Twidwell present. Dr. Rao asked questions regarding Geodon's effect on improving sleep. Relator Booker informed Dr. Rao that Geodon is not indicated to improve sleep. Relator Booker added that Geodon improved symptoms that are associated with bi-polar mania and mixed episodes and that one of eleven symptoms measured in the mania rating scale

mentions improvement in sleep. Relator Booker advised Dr. Rao that the entire scale should be evaluated as a whole.

130. In a coaching session after this meeting with Dr. Rao, Twidwell told Relator Booker that he should have emphasized to Dr. Rao how Geodon improves sleep and how Geodon improves cognition in bi-polar patients based on the Harvey clinical study attached as **Exhibit 2**. Relator Booker disagreed with Twidwell and noted that Geodon does not have an indication for sleep, that Geodon, did not have an indication for cognitive improvement, and that the Harvey study did not substantiate that Geodon improved cognitive function in all patients. District Manager Twidwell told Relator Booker that he should do things Twidwell's way and not challenge Twidwell.

131. On September 16, 2009, Twidwell held a district POA (plan of action) meeting calling for the off-label promotion of Geodon. During this meeting, Relator Booker objected to the planned promotion of Geodon as an adjunct to bezodiazepines because Pfizer did not have such an approved indication or any adjunctive use studies.

132. Twidwell directed his sales representatives, including Relator Booker, to use the Harvey clinical study titled "Improvement in Cognitive Function following a Switch to Ziprasidone from Conventional Antipsychotics, Olanzapine, or Risperidone in Outpatients with Schizophrenia" (attached as **Exhibit 2**) and the Stephen M. Stahl clinical study titled "The Psychopharmacy of Ziprasidone: Receptor-Binding Properties and Real-World Psychiatric Practice (abstract attached as **Exhibit 3**) to promote that Geodon will improve cognition in all patient types including bi-polar patients. Relator Booker objected that the Harvey clinical study was a switch study to determine whether patients may exhibit some cognitive improvement if they changed antipsychotic therapy.

Relator Booker added that the Harvey clinical study did not substantiate that all patients will improve cognitively from Geodon and that any such claim was inaccurate. Relator Booker said that Abilify had several more indications than Geodon and Pfizer had no comparative data, therefore, making claims about comparative efficacy inaccurate. Twidwell became very annoyed. Relator Booker further explained that the Stahl clinical study is a research paper which, discusses the theory of actions of brain receptors. He added that because the Stahl clinical study was not designed to determine whether Geodon improved cognitive function, it would be inaccurate to claim that it supported such a claim.

133. Twidwell further instructed his sales representatives to use the clinical study by Leslie Citrome, M.D. titled "Efficacy of Ziprasidone Against Hostility in Schizophrenia: Post Hoc Analysis of Randomized, Open-Label Study Data" and attached as **Exhibit 6,** to promote that Geodon will improve symptoms of aggression and overt anger in all patient types and Geodon will improve these symptoms better than Abilify. Relator Booker objected because the Citrome clinical study demonstrated that Geodon is an effective treatment for hostility in patients with schizophrenia or schizoaffective disorder, but was not designed to determine if Geodon improves overt anger in all patients. Thus to make this statement is an inaccurate claim. Moreover, the Citrome clinical study was not designed to determine if Geodon was more effective then Abilify thus this also was an inaccurate claim. Relator Booker further stated that the Stahl clinical study was not designed to determine if Geodon improved overt anger or hostility and thus did not support that claim.

134. Twidwell then directed that the clinical study by David Daniel, M.D., titled "Ziprasidone 80mg/day and 160 mg/day in the Acute Exacerbation of Schizophrenia and Schizoaffective Disorder: A 6-Week Placebo-Controlled Trial" attached as **Exhibit 17** will be used to promote to doctors that Geodon works for patients suffering from depression. Twidwell stated that figure 3 on page 498 illustrating the MADRS scale (which is a depression only scale) proved that Geodon works for depression. Relator Booker objected because the Daniel clinical study was designed to determine whether Geodon was effective in treating symptoms of schizophrenia, but was not designed to determine if Geodon was effective in treating depression. Relator Booker also noted that the Stahl clinical study was not designed to determine if Geodon improved depression and thus did not support that claim.

135. Twidwell instructed his sales representatives to use the Jeffrey A. Lieberman, M.D. clinical study titled "Effectiveness of Antipyschotic Drugs in Patients with Chronic Schizophrenia" attached as **Exhibit 49** to promote that Geodon improves metabolism better than Abilify. Twidwell stated that the Pfizer promotional slide that was extrapolated from the Lieberman clinical study comparing the weight effect of Geodon versus Abilify should be used to promote than Geodon has better effects on long-term weight increase than Ability. Relator Booker objected that Pfizer's promotional slide was inaccurate and Twidwell's statement was an inappropriate claim because there are no relevant head-to-head studies.

136. Finally, Twidwell directed his sales representatives to use the Peter J. Weiden, M.D. clinical paper titled "Long – Term Changes in Weight and Plasma Lipids during Maintenance Treatment with Ziprasidone" to promote Geodon for long-term use

in all patient types including bi-polar patients and as an antipsychotic agent that can lower weight and lipids. Relator Booker objected because the Weiden clinical study was designed to measure long-term changes in weight and plasma lipids of only schizophrenia patients taking Geodon.

137. During the September 16, 2009, POA meeting, Twidwell distributed the handout attached as **Exhibit 4**.

138. On October 14, 2009, Relator Booker presented data on Geodon's uses for bi-polar mania and mixed episodes to Dr. Michael Stotler with Twidwell present. After this meeting, Twidwell coached Relator Booker to use the Citrome clinical study to make a comparison between Geodon and Abilify on improving overt anger. Relator Booker objected because the two drugs are not compared to each other in the Citrome clinical study and because there are no head-to-head studies comparing Geodon against Abilify for purposes of improving overt anger.

139. Later on October 14, 2009, Relator Booker presented the Harvey clinical study to Dr. Vikrant Mittal with Twidwell present. After this meeting, Twidwell coached Relator Booker to sell Geodon because it improves cognition in patients. Twidwell told Relator Booker to use more real life descriptions to emphasize how Geodon can improve cognition in bi-polar patients, such as talking about how a grandmother could improve her cooking skills for the holidays by improving her ability to remember recipes. Relator Booker replied that the Harvey clinical study did not substantiate that all patients will improve cognitively from Geodon and that the Stahl clinical study was not designed to determine if Geodon improved cognitive function.

140. Later in October 2009, Relator Booker called the Pfizer Compliance Hotline to make a confidential anonymous report on how Twidwell was using false representations to sell Geodon off-label. Relator Booker was given the confidential code of PFIZ-09-10-0044 PIN number B8E3. Relator Booker called back at the end of October 2009, to get feedback on his report, but there was no feedback.

141. On December 12, 2009, Twidwell coached his sales representatives during a morning meeting at the Marriott Hotel in Chesterfield, Missouri to promote Geodon as an adjunctive agent to use with other antipsychotic agents such as Seroquel, Risperdal, Zyprexa and other antipsychotic agents. The sales representatives present in addition to Relator Booker included Stephanie Fischer, Kristi Nelson, and Kelly Huffman. Twidwell instructed his sales representatives to highlight Geodon package insert data that states Geodon is metabolized by the liver enzyme system only one-third of the time and, therefore, causes less drug-to-drug interaction than other antipsychotic agents. Twidwell was directing off-label promotion because (1) Pfizer lacked any studies showing that Geodon could be used successfully as an adjunct with other antipsychotics, and (2) Pfizer lacked any studies comparing the metabolism of Geodon to that of any other antipsychotic agents.

142. On December 14, 2009, Regional Manager Don Sanderson attended Relator Booker's sales calls. Prior to starting the sales calls, Relator Booker showed Sanderson the off-label marketing materials distributed by Twidwell at the September 16, 2009, POA meeting, including **Exhibit 4,** and objected to Twidwell's off-label marketing strategy. Sanderson did not respond. During these sales calls, Relator Booker did not use the off-label marketing materials distributed by Twidwell including **Exhibit 4.** At the

end of the day, Sanderson coached Relator Booker to "compare and win" by comparing the akathisia profile of Geodon with Abilify's, based on Abilify package inserts which list a high level of the side effect akathisia. Sanderson was directing off-label promotion because (1) Pfizer had no head-to-head clinical data comparing the levels of the akathisia side effect in patients prescribed Geodon versus in patients prescribed Abilify, and (2) the concept for comparing the side effect akathisia came from comments made by doctors who discussed good results obtained from using Abilify for indications that Geodon lacked.

143. On January 5, 2010, Relator Booker sent the email attached as **Exhibit 48** to Pfizer Corporate Compliance. In it, Relator Booker reported on and objected to the off-label Geodon sales practices promoted by District Manager Jon Twidwell at the September 16, 2009, POA meeting. This email included the handout Twidwell distributed during the September 16 meeting (**Exhibit 4**). In his email to Corporate Compliance, Relator Booker reported that the district sales representatives "have been directed by Jon Twidwell to carry a special binder with this [handout] and these clinical studies that can be manipulated to promote these inappropriate claims."

144. On the following day, January 6, 2010, Pfizer illegally discharged Relator Booker because of lawful acts Relator Booker did to stop Pfizer's False Claims Act violations.

**PFIZER'S CONTINUED PATTERN OF OFF-LABEL PROMOTION VIOLATES ITS 2009 SETTLEMENT AGREEMENT WITH THE DEPARTMENT OF JUSTICE**

145. In August 2009, Pfizer made a $2.3 billion settlement with the Department of Justice to resolve nine FCA off-label promotion cases.

146. That settlement agreement resolved allegations that from 2001 through 2007 Pfizer illegally promoted Geodon "for a variety of off-label conditions (including depression [and], : maintenance"; illegally promoted Geodon for pediatric and adolescent patients; paid illegal remuneration to induce health care professionals to prescribe Geodon; and made or disseminated unsubstantiated or false representation about the safety and efficacy of Geodon.

147. That settlement agreement also resolved allegations that Pfizer had illegally promoted Bextra "at dosages other than those for which its use was approved by the Food and Drug Administration."

148. That settlement agreement also resolved allegations that Pfizer had illegally promoted Lyrica for off-label pain conditions.

149. As shown above, Pfizer knowingly violated its August 2009 settlement agreement with the Department of Justice by almost immediately resuming promoting Geodon for a variety of off-label conditions, including depression and : maintenance; by resuming illegally promoting Geodon for pediatric and adolescent patients; by resuming paying illegal remuneration to induce prescriptions of Geodon; and by making false representations about the safety and efficacy of Geodon.

150. As shown above, Pfizer knowingly violated its August 2009 settlement agreement with the Department of Justice by almost immediately starting to illegally promote Pristiq at the 100 mg dosage, rather than the 50 mg dosage approved by the FDA; by almost immediately starting to promote Pristiq for off-label pain conditions; by almost immediately paying illegal remuneration to induce prescriptions of Pristiq; and by almost immediately making false representations about the safety and efficacy of Pristiq.

**COUNT I**
**Violations of False Claims Act**
**31 U.S.C. §3729**

151. Relator realleges and incorporates by reference paragraphs 1-150.

152. From January 2008 to the present, Pfizer knowingly caused physicians to present false and fraudulent claims to the Medicare program and to other Government Health Care Programs by promoting off-label prescriptions of Pristiq and Geodon.

153. From January 2008 to the present, Pfizer knowingly made false and fraudulent statements to physicians, material to false and fraudulent claims presented to the Medicare program and to other federal health care programs for off-label prescriptions of Pristiq and Geodon, by making misleading statements to physicians based on misrepresentations of multiple clinical studies; by failing to advise physicians of scientific data questioning the safety of Geodon when used by children and adolescents and concerns raised by the FDA about the safety of Geodon when used by children and adolescents; and by marketing Pristiq to psychiatrists by promoting its low discontinuation rate at the 50 milligram dose without mentioning the substantially increased side-effects of Pristiq at higher doses.

154. From January 2008 to the present, Pfizer conspired with its managers and employees to (1) knowingly cause physicians to present false and fraudulent claims to the Medicare program and to other federal health care programs by promoting off-label prescriptions of Pristiq and Geodon, and (2) to knowingly make false and fraudulent statements material to those false and fraudulent claims by making misleading statements to physicians based on misrepresentations of multiple clinical studies.

155. From February 2010 to the present, Pfizer knowingly made and used false records and statements to conceal, avoid and decrease Pfizer's obligations under its Corporate Integrity Agreement to pay or transmit money or property to the Government.

156. From March 23, 2010 to the present, Pfizer knowingly made and used false records and statements material to Pfizer's obligations under its Corporate Integrity Agreement to pay or transmit money or property to the Government.

157. From March 23, 2010 to the present, Pfizer knowingly and improperly avoided and decreased its obligations under its Corporate Integrity Agreement to pay or transmit money or property to the Government.

## COUNT II
## Violations of California False Claims Act
## California Government Code Section §12651(a)

158. Relator realleges and incorporates by reference paragraphs 1-150.

159. From January 2008 to the present, Pfizer knowingly caused physicians to present false and fraudulent claims to the California Medicaid program by promoting off-label prescriptions of Pristiq and Geodon.

160. From January 2008 to the present, Pfizer knowingly made false and fraudulent statements to physicians, material to false and fraudulent claims presented to the California Medicaid program for off-label prescriptions of Pristiq and Geodon by making misleading statements to physicians based on misrepresentations of multiple clinical studies; by failing to advise physicians of scientific data questioning the safety of Geodon when used by children and adolescents and concerns raised by the FDA about the safety of Geodon when used by children and adolescents; and by marketing Pristiq to

psychiatrists by promoting its low discontinuation rate at the 50 milligram dose without mentioning the substantially increased side effects of Pristiq at higher doses.

161. From January 2008 to the present, Pfizer conspired with its managers and employees to (1) knowingly cause physicians to present false and fraudulent claims to the California Medicaid program by promoting off-label prescriptions of Pristiq and Geodon, and (2) to knowingly make false and fraudulent statements material to those false and fraudulent claims by making misleading statements to physicians based on misrepresentations of multiple clinical studies.

**COUNT III**
**Violations of Colorado Medicaid False Claims Act**

162. Relator realleges and incorporates by reference paragraphs 1-150.

163. From January 2008 to the present, Pfizer knowingly caused physicians to present false and fraudulent claims to the Colorado Medicaid program by promoting off-label prescriptions of Pristiq and Geodon.

164. From January 2008 to the present, Pfizer knowingly made false and fraudulent statements to physicians, material to false and fraudulent claims presented to the Colorado Medicaid program for off-label prescriptions of Pristiq and Geodon by making misleading statements to physicians based on misrepresentations of multiple clinical studies; by failing to advise physicians of scientific data questioning the safety of Geodon when used by children and adolescents and concerns raised by the FDA about the safety of Geodon when used by children and adolescents; and by marketing Pristiq to psychiatrists by promoting its low discontinuation rate at the 50 milligram dose without mentioning the substantially increased side effects of Pristiq at higher doses.

165. From January 2008 to the present, Pfizer conspired with its managers and employees to (1) knowingly cause physicians to present false and fraudulent claims to the Colorado Medicaid program by promoting off-label prescriptions of Pristiq and Geodon, and (2) to knowingly make false and fraudulent statements material to those false and fraudulent claims by making misleading statements to physicians based on misrepresentations of multiple clinical studies.

**COUNT IV**
**Violations of Connecticut False Claims Act**
**Connecticut General Statutes Annotated §17b-301d**

166. Relator realleges and incorporates by reference paragraphs 1-150.

167. From January 2008 to the present, Pfizer knowingly caused physicians to present false and fraudulent claims to the Connecticut Medicaid program by promoting off-label prescriptions of Pristiq and Geodon.

168. From January 2008 to the present, Pfizer knowingly made false and fraudulent statements to physicians, material to false and fraudulent claims presented to the Connecticut Medicaid program for off-label prescriptions of Pristiq and Geodon by making misleading statements to physicians based on misrepresentations of multiple clinical studies; by failing to advise physicians of scientific data questioning the safety of Geodon when used by children and adolescents and concerns raised by the FDA about the safety of Geodon when used by children and adolescents; and by marketing Pristiq to psychiatrists by promoting its low discontinuation rate at the 50 milligram dose without mentioning the substantially increased side effects of Pristiq at higher doses.

169. From January 2008 to the present, Pfizer conspired with its managers and employees to (1) knowingly cause physicians to present false and fraudulent claims to the

Connecticut Medicaid program by promoting off-label prescriptions of Pristiq and Geodon, and (2) to knowingly make false and fraudulent statements material to those false and fraudulent claims by making misleading statements to physicians based on misrepresentations of multiple clinical studies.

**COUNT V**
**Violations of Delaware False Claims and Reporting Act**
**Title 6, Delaware Code, §1201(a)**

170. Relator realleges and incorporates by reference paragraphs 1-150.

171. From January 2008 to the present, Pfizer knowingly caused physicians to present false and fraudulent claims to the Delaware Medicaid program by promoting off-label prescriptions of Pristiq and Geodon.

172. From January 2008 to the present, Pfizer knowingly made false and fraudulent statements to physicians, material to false and fraudulent claims presented to the Delaware Medicaid program for off-label prescriptions of Pristiq and Geodon by making misleading statements to physicians based on misrepresentations of multiple clinical studies; by failing to advise physicians of scientific data questioning the safety of Geodon when used by children and adolescents and concerns raised by the FDA about the safety of Geodon when used by children and adolescents; and by marketing Pristiq to psychiatrists by promoting its low discontinuation rate at the 50 milligram dose without mentioning the substantially increased side effects of Pristiq at higher doses.

173. From January 2008 to the present, Pfizer conspired with its managers and employees to (1) knowingly cause physicians to present false and fraudulent claims to the Delaware Medicaid program by promoting off-label prescriptions of Pristiq and Geodon, and (2) to knowingly make false and fraudulent statements material to those false and

fraudulent claims by making misleading statements to physicians based on misrepresentations of multiple clinical studies.

**COUNT VI**
**Violations of District of Columbia Procurement Reform Amendment Act**
**District of Columbia Statutes §2-308.14**

174. Relator realleges and incorporates by reference paragraphs 1-150.

175. From January 2008 to the present, Pfizer knowingly caused physicians to present false and fraudulent claims to the District of Columbia Medicaid program by promoting off-label prescriptions of Pristiq and Geodon.

176. From January 2008 to the present, Pfizer knowingly made false and fraudulent statements to physicians, material to false and fraudulent claims presented to the District of Columbia Medicaid program for off-label prescriptions of Pristiq and Geodon by making misleading statements to physicians based on misrepresentations of multiple clinical studies; by failing to advise physicians of scientific data questioning the safety of Geodon when used by children and adolescents and concerns raised by the FDA about the safety of Geodon when used by children and adolescents; and by marketing Pristiq to psychiatrists by promoting its low discontinuation rate at the 50 milligram dose without mentioning the substantially increased side effects of Pristiq at higher doses.

177. From January 2008 to the present, Pfizer conspired with its managers and employees to (1) knowingly cause physicians to present false and fraudulent claims to the District of Columbia Medicaid program by promoting off-label prescriptions of Pristiq and Geodon, and (2) to knowingly make false and fraudulent statements material to those false and fraudulent claims by making misleading statements to physicians based on misrepresentations of multiple clinical studies.

**COUNT VII**
**Violations of Florida False Claims Act**
**Florida Statute 68.082(2)**

178. Relator realleges and incorporates by reference paragraphs 1-150.

179. From January 2008 to the present, Pfizer knowingly caused physicians to present false and fraudulent claims to the Florida Medicaid program by promoting off-label prescriptions of Pristiq and Geodon.

180. From January 2008 to the present, Pfizer knowingly made false and fraudulent statements to physicians, material to false and fraudulent claims presented to the Florida Medicaid program for off-label prescriptions of Pristiq and Geodon by making misleading statements to physicians based on misrepresentations of multiple clinical studies; by failing to advise physicians of scientific data questioning the safety of Geodon when used by children and adolescents and concerns raised by the FDA about the safety of Geodon when used by children and adolescents; and by marketing Pristiq to psychiatrists by promoting its low discontinuation rate at the 50 milligram dose without mentioning the substantially increased side effects of Pristiq at higher doses.

181. From January 2008 to the present, Pfizer conspired with its managers and employees to (1) knowingly cause physicians to present false and fraudulent claims to the Florida Medicaid program by promoting off-label prescriptions of Pristiq and Geodon, and (2) to knowingly make false and fraudulent statements material to those false and fraudulent claims by making misleading statements to physicians based on misrepresentations of multiple clinical studies.

**COUNT IX**
**Violations of Hawaii False Claims Act**
**13 Hawaii Revised Code §661-21**

182. Relator realleges and incorporates by reference paragraphs 1-150.

183. From January 2008 to the present, Pfizer knowingly caused physicians to present false and fraudulent claims to the Hawaii Medicaid program by promoting off-label prescriptions of Pristiq and Geodon.

184. From January 2008 to the present, Pfizer knowingly made false and fraudulent statements to physicians, material to false and fraudulent claims presented to the Hawaii Medicaid program for off-label prescriptions of Pristiq and Geodon by making misleading statements to physicians based on misrepresentations of multiple clinical studies; by failing to advise physicians of scientific data questioning the safety of Geodon when used by children and adolescents and concerns raised by the FDA about the safety of Geodon when used by children and adolescents; and by marketing Pristiq to psychiatrists by promoting its low discontinuation rate at the 50 milligram dose without mentioning the substantially increased side effects of Pristiq at higher doses.

185. From January 2008 to the present, Pfizer conspired with its managers and employees to (1) knowingly cause physicians to present false and fraudulent claims to the Hawaii Medicaid program by promoting off-label prescriptions of Pristiq and Geodon, and (2) to knowingly make false and fraudulent statements material to those false and fraudulent claims by making misleading statements to physicians based on misrepresentations of multiple clinical studies.

**COUNT X**
**Violations of Illinois Whistleblower Reward and Protection Act**
**740 Illinois Compiled Statutes 175/3**

186. Relator realleges and incorporates by reference paragraphs 1-150.

187. From January 2008 to the present, Pfizer knowingly caused physicians to present false and fraudulent claims to the Illinois Medicaid program by promoting off-label prescriptions of Pristiq and Geodon.

188. From January 2008 to the present, Pfizer knowingly made false and fraudulent statements to physicians, material to false and fraudulent claims presented to the Illinois Medicaid program for off-label prescriptions of Pristiq and Geodon by making misleading statements to physicians based on misrepresentations of multiple clinical studies; by failing to advise physicians of scientific data questioning the safety of Geodon when used by children and adolescents and concerns raised by the FDA about the safety of Geodon when used by children and adolescents; and by marketing Pristiq to psychiatrists by promoting its low discontinuation rate at the 50 milligram dose without mentioning the substantially increased side effects of Pristiq at higher doses.

189. From January 2008 to the present, Pfizer conspired with its managers and employees to (1) knowingly cause physicians to present false and fraudulent claims to the Illinois Medicaid program by promoting off-label prescriptions of Pristiq and Geodon, and (2) to knowingly make false and fraudulent statements material to those false and fraudulent claims by making misleading statements to physicians based on misrepresentations of multiple clinical studies.

**COUNT XI**
**Violations of Indiana False Claims Act**
**Indiana Code 5-11-5.5-2**

190. Relator realleges and incorporates by reference paragraphs 1-150.

191. From January 2008 to the present, Pfizer knowingly caused physicians to present false and fraudulent claims to the Indiana Medicaid program by promoting off-label prescriptions of Pristiq and Geodon.

192. From January 2008 to the present, Pfizer knowingly made false and fraudulent statements to physicians, material to false and fraudulent claims presented to the Indiana Medicaid program for off-label prescriptions of Pristiq and Geodon by making misleading statements to physicians based on misrepresentations of multiple clinical studies; by failing to advise physicians of scientific data questioning the safety of Geodon when used by children and adolescents and concerns raised by the FDA about the safety of Geodon when used by children and adolescents; and by marketing Pristiq to psychiatrists by promoting its low discontinuation rate at the 50 milligram dose without mentioning the substantially increased side effects of Pristiq at higher doses.

193. From January 2008 to the present, Pfizer conspired with its managers and employees to (1) knowingly cause physicians to present false and fraudulent claims to the Indiana Medicaid program by promoting off-label prescriptions of Pristiq and Geodon, and (2) to knowingly make false and fraudulent statements material to those false and fraudulent claims by making misleading statements to physicians based on misrepresentations of multiple clinical studies.

**COUNT XII**
**Violations of Louisiana Medical Assistance Programs Integrity Law Revised Louisiana Statutes 46:438.3**

194. Relator realleges and incorporates by reference paragraphs 1-150.

195. From January 2008 to the present, Pfizer knowingly caused physicians to present false and fraudulent claims to the Louisiana Medicaid program by promoting off-label prescriptions of Pristiq and Geodon.

196. From January 2008 to the present, Pfizer knowingly made false and fraudulent statements to physicians, material to false and fraudulent claims presented to the Louisiana Medicaid program for off-label prescriptions of Pristiq and Geodon by making misleading statements to physicians based on misrepresentations of multiple clinical studies; by failing to advise physicians of scientific data questioning the safety of Geodon when used by children and adolescents and concerns raised by the FDA about the safety of Geodon when used by children and adolescents; and by marketing Pristiq to psychiatrists by promoting its low discontinuation rate at the 50 milligram dose without mentioning the substantially increased side effects of Pristiq at higher doses.

197. From January 2008 to the present, Pfizer conspired with its managers and employees to (1) knowingly cause physicians to present false and fraudulent claims to the Louisiana Medicaid program by promoting off-label prescriptions of Pristiq and Geodon, and (2) to knowingly make false and fraudulent statements material to those false and fraudulent claims by making misleading statements to physicians based on misrepresentations of multiple clinical studies.

**COUNT XIII**
**Violation of Maryland False Health Claims Act**
**Annotated Code of Maryland §2-602**

198. Relator realleges and incorporates by reference paragraphs 1-150.

199. From January 2008 to the present, Pfizer knowingly caused physicians to present false and fraudulent claims to the Maryland Medicaid program by promoting off-label prescriptions of Pristiq and Geodon.

200. From January 2008 to the present, Pfizer knowingly made false and fraudulent statements to physicians, material to false and fraudulent claims presented to the Maryland Medicaid program for off-label prescriptions of Pristiq and Geodon by making misleading statements to physicians based on misrepresentations of multiple clinical studies; by failing to advise physicians of scientific data questioning the safety of Geodon when used by children and adolescents and concerns raised by the FDA about the safety of Geodon when used by children and adolescents; and by marketing Pristiq to psychiatrists by promoting its low discontinuation rate at the 50 milligram dose without mentioning the substantially increased side effects of Pristiq at higher doses.

201. From January 2008 to the present, Pfizer conspired with its managers and employees to (1) knowingly cause physicians to present false and fraudulent claims to the Maryland Medicaid program by promoting off-label prescriptions of Pristiq and Geodon, and (2) to knowingly make false and fraudulent statements material to those false and fraudulent claims by making misleading statements to physicians based on misrepresentations of multiple clinical studies.

**COUNT XIV**
**Violations of Massachusetts False Claims Act**
**12 Massachusetts Compiled Laws Section 5B**

202. Relator realleges and incorporates by reference paragraphs 1-150.

203. From January 2008 to the present, Pfizer knowingly caused physicians to present false and fraudulent claims to the Massachusetts Medicaid program by promoting off-label prescriptions of Pristiq and Geodon.

204. From January 2008 to the present, Pfizer knowingly made false and fraudulent statements to physicians, material to false and fraudulent claims presented to the Massachusetts Medicaid program for off-label prescriptions of Pristiq and Geodon by making misleading statements to physicians based on misrepresentations of multiple clinical studies; by failing to advise physicians of scientific data questioning the safety of Geodon when used by children and adolescents and concerns raised by the FDA about the safety of Geodon when used by children and adolescents; and by marketing Pristiq to psychiatrists by promoting its low discontinuation rate at the 50 milligram dose without mentioning the substantially increased side effects of Pristiq at higher doses.

205. From January 2008 to the present, Pfizer conspired with its managers and employees to (1) knowingly cause physicians to present false and fraudulent claims to the Massachusetts Medicaid program by promoting off-label prescriptions of Pristiq and Geodon, and (2) to knowingly make false and fraudulent statements material to those false and fraudulent claims by making misleading statements to physicians based on misrepresentations of multiple clinical studies.

**COUNT XV**
**Violations of Michigan False Claims Act**
**Michigan Compiled Laws 400.607**

206. Relator realleges and incorporates by reference paragraphs 1-150.

207. From January 2008 to the present, Pfizer knowingly caused physicians to present false and fraudulent claims to the Michigan Medicaid program by promoting off-label prescriptions of Pristiq and Geodon.

208. From January 2008 to the present, Pfizer knowingly made false and fraudulent statements to physicians, material to false and fraudulent claims presented to the Michigan Medicaid program for off-label prescriptions of Pristiq and Geodon by making misleading statements to physicians based on misrepresentations of multiple clinical studies; by failing to advise physicians of scientific data questioning the safety of Geodon when used by children and adolescents and concerns raised by the FDA about the safety of Geodon when used by children and adolescents; and by marketing Pristiq to psychiatrists by promoting its low discontinuation rate at the 50 milligram dose without mentioning the substantially increased side effects of Pristiq at higher doses.

209. From January 2008 to the present, Pfizer conspired with its managers and employees to (1) knowingly cause physicians to present false and fraudulent claims to the Michigan Medicaid program by promoting off-label prescriptions of Pristiq and Geodon, and (2) to knowingly make false and fraudulent statements material to those false and fraudulent claims by making misleading statements to physicians based on misrepresentations of multiple clinical studies.

**COUNT XVI**
**Violations of Minnesota False Claims Act**
**Minnesota Statutes Annotated §15C.02**

210. Relator realleges and incorporates by reference paragraphs 1-150.

211. From January 2008 to the present, Pfizer knowingly caused physicians to present false and fraudulent claims to the Minnesota Medicaid program by promoting off-label prescriptions of Pristiq and Geodon.

212. From January 2008 to the present, Pfizer knowingly made false and fraudulent statements to physicians, material to false and fraudulent claims presented to the Minnesota Medicaid program for off-label prescriptions of Pristiq and Geodon by making misleading statements to physicians based on misrepresentations of multiple clinical studies; by failing to advise physicians of scientific data questioning the safety of Geodon when used by children and adolescents and concerns raised by the FDA about the safety of Geodon when used by children and adolescents; and by marketing Pristiq to psychiatrists by promoting its low discontinuation rate at the 50 milligram dose without mentioning the substantially increased side effects of Pristiq at higher doses.

213. From January 2008 to the present, Pfizer conspired with its managers and employees to (1) knowingly cause physicians to present false and fraudulent claims to the Minnesota Medicaid program by promoting off-label prescriptions of Pristiq and Geodon, and (2) to knowingly make false and fraudulent statements material to those false and fraudulent claims by making misleading statements to physicians based on misrepresentations of multiple clinical studies.

**COUNT XVII**
**Violation of Montana False Claims Act**
**Montana Code Annotated 17-8-403**

214. Relator realleges and incorporates by reference paragraphs 1-150.

215. From January 2008 to the present, Pfizer knowingly caused physicians to present false and fraudulent claims to the Montana Medicaid program by promoting off-label prescriptions of Pristiq and Geodon.

216. From January 2008 to the present, Pfizer knowingly made false and fraudulent statements to physicians, material to false and fraudulent claims presented to the Montana Medicaid program for off-label prescriptions of Pristiq and Geodon by making misleading statements to physicians based on misrepresentations of multiple clinical studies; by failing to advise physicians of scientific data questioning the safety of Geodon when used by children and adolescents and concerns raised by the FDA about the safety of Geodon when used by children and adolescents; and by marketing Pristiq to psychiatrists by promoting its low discontinuation rate at the 50 milligram dose without mentioning the substantially increased side effects of Pristiq at higher doses.

217. From January 2008 to the present, Pfizer conspired with its managers and employees to (1) knowingly cause physicians to present false and fraudulent claims to the Montana Medicaid program by promoting off-label prescriptions of Pristiq and Geodon, and (2) to knowingly make false and fraudulent statements material to those false and fraudulent claims by making misleading statements to physicians based on misrepresentations of multiple clinical studies.

**COUNT XVIII**
**Violation of Nevada False Claims Act**
**Nevada Revised Statutes 357.040**

218. Relator realleges and incorporates by reference paragraphs 1-150.

219. From January 2008 to the present, Pfizer knowingly caused physicians to present false and fraudulent claims to the Nevada Medicaid program by promoting off-label prescriptions of Pristiq and Geodon.

220. From January 2008 to the present, Pfizer knowingly made false and fraudulent statements to physicians, material to false and fraudulent claims presented to the Nevada Medicaid program for off-label prescriptions of Pristiq and Geodon by making misleading statements to physicians based on misrepresentations of multiple clinical studies; by failing to advise physicians of scientific data questioning the safety of Geodon when used by children and adolescents and concerns raised by the FDA about the safety of Geodon when used by children and adolescents; and by marketing Pristiq to psychiatrists by promoting its low discontinuation rate at the 50 milligram dose without mentioning the substantially increased side effects of Pristiq at higher doses.

221. From January 2008 to the present, Pfizer conspired with its managers and employees to (1) knowingly cause physicians to present false and fraudulent claims to the Nevada Medicaid program by promoting off-label prescriptions of Pristiq and Geodon, and (2) to knowingly make false and fraudulent statements material to those false and fraudulent claims by making misleading statements to physicians based on misrepresentations of multiple clinical studies.

**COUNT XIX**
**Violations of New Hampshire False Claims Act**
**New Hampshire Revised Statutes 167:61-b**

222. Relator realleges and incorporates by reference paragraphs 1-150.

223. From January 2008 to the present, Pfizer knowingly caused physicians to present false and fraudulent claims to the New Hampshire Medicaid program by promoting off-label prescriptions of Pristiq and Geodon.

224. From January 2008 to the present, Pfizer knowingly made false and fraudulent statements to physicians, material to false and fraudulent claims presented to the New Hampshire Medicaid program for off-label prescriptions of Pristiq and Geodon by making misleading statements to physicians based on misrepresentations of multiple clinical studies; by failing to advise physicians of scientific data questioning the safety of Geodon when used by children and adolescents and concerns raised by the FDA about the safety of Geodon when used by children and adolescents; and by marketing Pristiq to psychiatrists by promoting its low discontinuation rate at the 50 milligram dose without mentioning the substantially increased side effects of Pristiq at higher doses.

225. From January 2008 to the present, Pfizer conspired with its managers and employees to (1) knowingly cause physicians to present false and fraudulent claims to the New Hampshire Medicaid program by promoting off-label prescriptions of Pristiq and Geodon, and (2) to knowingly make false and fraudulent statements material to those false and fraudulent claims by making misleading statements to physicians based on misrepresentations of multiple clinical studies.

**COUNT XX**
**Violations of New Jersey False Claims Act**
**New Jersey Statutes 2A:32C-3**

226. Relator realleges and incorporates by reference paragraphs 1-150.

227. From January 2008 to the present, Pfizer knowingly caused physicians to present false and fraudulent claims to the New Jersey Medicaid program by promoting off-label prescriptions of Pristiq and Geodon.

228. From January 2008 to the present, Pfizer knowingly made false and fraudulent statements to physicians, material to false and fraudulent claims presented to the New Jersey Medicaid program for off-label prescriptions of Pristiq and Geodon by making misleading statements to physicians based on misrepresentations of multiple clinical studies; by failing to advise physicians of scientific data questioning the safety of Geodon when used by children and adolescents and concerns raised by the FDA about the safety of Geodon when used by children and adolescents; and by marketing Pristiq to psychiatrists by promoting its low discontinuation rate at the 50 milligram dose without mentioning the substantially increased side effects of Pristiq at higher doses.

229. From January 2008 to the present, Pfizer conspired with its managers and employees to (1) knowingly cause physicians to present false and fraudulent claims to the New Jersey Medicaid program by promoting off-label prescriptions of Pristiq and Geodon, and (2) to knowingly make false and fraudulent statements material to those false and fraudulent claims by making misleading statements to physicians based on misrepresentations of multiple clinical studies.

**COUNT XXI**
**Violations of New Mexico False Claims Act**
**New Mexico Statutes Annotated §27-14-4**

230. Relator realleges and incorporates by reference paragraphs 1-150.

231. From January 2008 to the present, Pfizer knowingly caused physicians to present false and fraudulent claims to the New Mexico Medicaid program and to other federal health care programs by promoting off-label prescriptions of Pristiq and Geodon.

232. From January 2008 to the present, Pfizer knowingly made false and fraudulent statements to physicians, material to false and fraudulent claims presented to the New Mexico Medicaid program for off-label prescriptions of Pristiq and Geodon by making misleading statements to physicians based on misrepresentations of multiple clinical studies; by failing to advise physicians of scientific data questioning the safety of Geodon when used by children and adolescents and concerns raised by the FDA about the safety of Geodon when used by children and adolescents; and by marketing Pristiq to psychiatrists by promoting its low discontinuation rate at the 50 milligram dose without mentioning the substantially increased side effects of Pristiq at higher doses.

233. From January 2008 to the present, Pfizer conspired with its managers and employees to (1) knowingly cause physicians to present false and fraudulent claims to the New Mexico Medicaid program by promoting off-label prescriptions of Pristiq and Geodon, and (2) to knowingly make false and fraudulent statements material to those false and fraudulent claims by making misleading statements to physicians based on misrepresentations of multiple clinical studies.

**COUNT XXII**
**Violations of New York False Claims Act**
**New York Finance Law Section 189**

234. Relator realleges and incorporates by reference paragraphs 1-150.

235. From January 2008 to the present, Pfizer knowingly caused physicians to present false and fraudulent claims to the New York Medicaid program by promoting off-label prescriptions of Pristiq and Geodon.

236. From January 2008 to the present, Pfizer knowingly made false and fraudulent statements to physicians, material to false and fraudulent claims presented to the New York Medicaid program for off-label prescriptions of Pristiq and Geodon by making misleading statements to physicians based on misrepresentations of multiple clinical studies; by failing to advise physicians of scientific data questioning the safety of Geodon when used by children and adolescents and concerns raised by the FDA about the safety of Geodon when used by children and adolescents; and by marketing Pristiq to psychiatrists by promoting its low discontinuation rate at the 50 milligram dose without mentioning the substantially increased side effects of Pristiq at higher doses.

237. From January 2008 to the present, Pfizer conspired with its managers and employees to (1) knowingly cause physicians to present false and fraudulent claims to the New York Medicaid program by promoting off-label prescriptions of Pristiq and Geodon, and (2) to knowingly make false and fraudulent statements material to those false and fraudulent claims by making misleading statements to physicians based on misrepresentations of multiple clinical studies.

**COUNT XXIII**
**Violations of North Carolina False Claims Act**
**North Carolina General Statutes 1-607**

238. Relator realleges and incorporates by reference paragraphs 1-150.

239. From January 2008 to the present, Pfizer knowingly caused physicians to present false and fraudulent claims to the North Carolina Medicaid program by promoting off-label prescriptions of Pristiq and Geodon.

240. From January 2008 to the present, Pfizer knowingly made false and fraudulent statements to physicians, material to false and fraudulent claims presented to the North Carolina Medicaid program for off-label prescriptions of Pristiq and Geodon by making misleading statements to physicians based on misrepresentations of multiple clinical studies; by failing to advise physicians of scientific data questioning the safety of Geodon when used by children and adolescents and concerns raised by the FDA about the safety of Geodon when used by children and adolescents; and by marketing Pristiq to psychiatrists by promoting its low discontinuation rate at the 50 milligram dose without mentioning the substantially increased side effects of Pristiq at higher doses.

241. From January 2008 to the present, Pfizer conspired with its managers and employees to (1) knowingly cause physicians to present false and fraudulent claims to the North Carolina Medicaid program by promoting off-label prescriptions of Pristiq and Geodon, and (2) to knowingly make false and fraudulent statements material to those false and fraudulent claims by making misleading statements to physicians based on misrepresentations of multiple clinical studies.

**COUNT XXIV**
**Violations of Oklahoma False Claims Act**
**Oklahoma Statutes Annotated §5053.1**

242. Relator realleges and incorporates by reference paragraphs 1-150.

243. From January 2008 to the present, Pfizer knowingly caused physicians to present false and fraudulent claims to the Oklahoma Medicaid program by promoting off-label prescriptions of Pristiq and Geodon.

244. From January 2008 to the present, Pfizer knowingly made false and fraudulent statements to physicians, material to false and fraudulent claims presented to the Oklahoma Medicaid program for off-label prescriptions of Pristiq and Geodon by making misleading statements to physicians based on misrepresentations of multiple clinical studies; by failing to advise physicians of scientific data questioning the safety of Geodon when used by children and adolescents and concerns raised by the FDA about the safety of Geodon when used by children and adolescents; and by marketing Pristiq to psychiatrists by promoting its low discontinuation rate at the 50 milligram dose without mentioning the substantially increased side effects of Pristiq at higher doses.

245. From January 2008 to the present, Pfizer conspired with its managers and employees to (1) knowingly cause physicians to present false and fraudulent claims to the Oklahoma Medicaid program by promoting off-label prescriptions of Pristiq and Geodon, and (2) to knowingly make false and fraudulent statements material to those false and fraudulent claims by making misleading statements to physicians based on misrepresentations of multiple clinical studies.

**COUNT XXV**
**Violations of Rhode Island False Claims Act**
**Rhode Island Statutes 9-1.1-3**

246. Relator realleges and incorporates by reference paragraphs 1-150.

247. From January 2008 to the present, Pfizer knowingly caused physicians to present false and fraudulent claims to the Rhode Island Medicaid program by promoting off-label prescriptions of Pristiq and Geodon.

248. From January 2008 to the present, Pfizer knowingly made false and fraudulent statements to physicians, material to false and fraudulent claims presented to the Rhode Island Medicaid program for off-label prescriptions of Pristiq and Geodon by making misleading statements to physicians based on misrepresentations of multiple clinical studies; by failing to advise physicians of scientific data questioning the safety of Geodon when used by children and adolescents and concerns raised by the FDA about the safety of Geodon when used by children and adolescents; and by marketing Pristiq to psychiatrists by promoting its low discontinuation rate at the 50 milligram dose without mentioning the substantially increased side effects of Pristiq at higher doses.

249. From January 2008 to the present, Pfizer conspired with its managers and employees to (1) knowingly cause physicians to present false and fraudulent claims to the Rhode Island Medicaid program by promoting off-label prescriptions of Pristiq and Geodon, and (2) to knowingly make false and fraudulent statements material to those false and fraudulent claims by making misleading statements to physicians based on misrepresentations of multiple clinical studies.

**COUNT XXVI**
**Violations of Tennessee False Claims Act**
**Tennessee Statutes 4-18-103**

250. Relator realleges and incorporates by reference paragraphs 1-150.

251 From January 2008 to the present, Pfizer knowingly caused physicians to present false and fraudulent claims to the Tennessee Medicaid program by promoting off-label prescriptions of Pristiq and Geodon.

252. From January 2008 to the present, Pfizer knowingly made false and fraudulent statements to physicians, material to false and fraudulent claims presented to the Tennessee Medicaid program for off-label prescriptions of Pristiq and Geodon by making misleading statements to physicians based on misrepresentations of multiple clinical studies; by failing to advise physicians of scientific data questioning the safety of Geodon when used by children and adolescents and concerns raised by the FDA about the safety of Geodon when used by children and adolescents; and by marketing Pristiq to psychiatrists by promoting its low discontinuation rate at the 50 milligram dose without mentioning the substantially increased side effects of Pristiq at higher doses.

253. From January 2008 to the present, Pfizer conspired with its managers and employees to (1) knowingly cause physicians to present false and fraudulent claims to the Tennessee Medicaid program by promoting off-label prescriptions of Pristiq and Geodon, and (2) to knowingly make false and fraudulent statements material to those false and fraudulent claims by making misleading statements to physicians based on misrepresentations of multiple clinical studies.

**COUNT XXVII**
**Violations of Texas False Claims Act**
**2 Texas Code 36.002**

254. Relator realleges and incorporates by reference paragraphs 1-150.

255. From January 2008 to the present, Pfizer knowingly caused physicians to present false and fraudulent claims to the Texas Medicaid program by promoting off-label prescriptions of Pristiq and Geodon.

256. From January 2008 to the present, Pfizer knowingly made false and fraudulent statements to physicians, material to false and fraudulent claims presented to the Texas Medicaid program for off-label prescriptions of Pristiq and Geodon by making misleading statements to physicians based on misrepresentations of multiple clinical studies; by failing to advise physicians of scientific data questioning the safety of Geodon when used by children and adolescents and concerns raised by the FDA about the safety of Geodon when used by children and adolescents; and by marketing Pristiq to psychiatrists by promoting its low discontinuation rate at the 50 milligram dose without mentioning the substantially increased side effects of Pristiq at higher doses.

257. From January 2008 to the present, Pfizer conspired with its managers and employees to (1) knowingly cause physicians to present false and fraudulent claims to the Texas Medicaid program by promoting off-label prescriptions of Pristiq and Geodon, and (2) to knowingly make false and fraudulent statements material to those false and fraudulent claims by making misleading statements to physicians based on misrepresentations of multiple clinical studies.

**COUNT XXVIII**
**Violations of Virginia Fraud Against Taxpayers Act**
**Virginia Statutes 8.01-216.3**

258. Relator realleges and incorporates by reference paragraphs 1-150.

259. From January 2008 to the present, Pfizer knowingly caused physicians to present false and fraudulent claims to the Virginia Medicaid program and to other federal health care programs by promoting off-label prescriptions of Pristiq and Geodon.

260. From January 2008 to the present, Pfizer knowingly made false and fraudulent statements to physicians, material to false and fraudulent claims presented to the Virginia Medicaid program for off-label prescriptions of Pristiq and Geodon by making misleading statements to physicians based on misrepresentations of multiple clinical studies; by failing to advise physicians of scientific data questioning the safety of Geodon when used by children and adolescents and concerns raised by the FDA about the safety of Geodon when used by children and adolescents; and by marketing Pristiq to psychiatrists by promoting its low discontinuation rate at the 50 milligram dose without mentioning the substantially increased side effects of Pristiq at higher doses.

261. From January 2008 to the present, Pfizer conspired with its managers and employees to (1) knowingly cause physicians to present false and fraudulent claims to the Virginia Medicaid program by promoting off-label prescriptions of Pristiq and Geodon, and (2) to knowingly make false and fraudulent statements material to those false and fraudulent claims by making misleading statements to physicians based on misrepresentations of multiple clinical studies.

**COUNT XXIV**
**Violations of Wisconsin False Claims Act**
**Wisconsin Statutes §20.931(2)**

262. Relator realleges and incorporates by reference paragraphs 1-150.

263. From January 2008 to the present, Pfizer knowingly caused physicians to present false and fraudulent claims to the Wisconsin Medicaid program by promoting off-label prescriptions of Pristiq and Geodon.

264. From January 2008 to the present, Pfizer knowingly made false and fraudulent statements to physicians, material to false and fraudulent claims presented to the Wisconsin Medicaid program for off-label prescriptions of Pristiq and Geodon by making misleading statements to physicians based on misrepresentations of multiple clinical studies; by failing to advise physicians of scientific data questioning the safety of Geodon when used by children and adolescents and concerns raised by the FDA about the safety of Geodon when used by children and adolescents; and by marketing Pristiq to psychiatrists by promoting its low discontinuation rate at the 50 milligram dose without mentioning the substantially increased side effects of Pristiq at higher doses.

265. From January 2008 to the present, Pfizer conspired with its managers and employees to (1) knowingly cause physicians to present false and fraudulent claims to the Wisconsin Medicaid program by promoting off-label prescriptions of Pristiq and Geodon, and (2) to knowingly make false and fraudulent statements material to those false and fraudulent claims by making misleading statements to physicians based on misrepresentations of multiple clinical studies.

**COUNT XXV**
**Violation of Anti-Retaliation Provision of the False Claims Act**
**31 U.S.C. §3730(h)**
**Relator Alex Booker**

266. Relator Alex Booker realleges and reincorporates by reference paragraphs 1-150.

267. Subsequent to its amendment in May 2009, the False Claims Act, 31 U.S.C. §3730(h), prohibits an employee from being discharged from employment because of lawful acts done by the employee to stop False Claims Act violations by his or her employer.

268. On January 6, 2010, Pfizer discharged Relator Booker because of lawful acts Relator Booker did to stop Pfizer's charged False Claims Act violations.

**PRAYER FOR RELIEF**

WHEREFORE, Relators respectfully request this Court enter judgment against Defendant and order:

(a) That the United States and the Plaintiff States be awarded damages in the amount of three times the damages sustained by the United States and the Plaintiff States because of the false and fraudulent claims alleged within this Complaint, as the False Claims Act, 31 U.S.C. §3729, and State False Claims Acts provide;

(b) That the maximum available civil penalties be imposed for each and every false and fraudulent claim that Defendant caused to be presented to the United States and the Plaintiff States;

(c) That pre and post-judgment interest be awarded, along with reasonable attorneys' fees, costs and expenses which Relators necessarily incurred in bringing and pressing this case;

(d) That the Court grant permanent injunctive relief to prevent any recurrence of the False Claims Act violations for which redress is sought in this Complaint;

(e) That the Relators be awarded the maximum relator share award allowed pursuant to the False Claims Act and State False Claims Acts;

(f) That Relator Booker be awarded all available damages, remedies and relief under 31 U.S.C. §3730(h), including two times back pay plus interest (and prejudgment interest), reinstatement or in lieu thereof front pay, compensation for any special damages, litigation costs, and reasonable attorney's fees; and

(g) That the Court award such other and further relief as it deems proper.

**Demand for Jury Trial**

Relators, on behalf of themselves, the United States and the Plaintiff States, demand a jury trial on all claims alleged herein.

Respectfully submitted,

Thomas N. Burnham
Michigan Bar P23311
Burnham International Law Office, PC
4140 Miller Road
Ann Arbor, Michigan 48103
tnburnham@earthlink.net
Counsel for *Qui Tam* Relators
Admitted Pro Hac Vice

Kevin J. Darken
Florida Bar No. 0090956
kdarken@tampalawfirm.com
THE COHEN LAW GROUP
201 East Kennedy Boulevard, Ste 1000
Tampa, Florida 33602
Telephone: (813) 225-1655
Facsimile: (813) 225-1921
Co-Counsel for *Qui Tam* Relators
Admitted Pro Hac Vice

**CERTIFICATE OF SERVICE**

I HEREBY CERIFY that the foregoing Fourth Amended Complaint has been furnished by ***Federal Express*** to: **Zach Cunha,** Assistant United States Attorney, United States Attorney's Office, John Joseph Moakley United States Courthouse, 1 Courthouse Way, Suite 9200, Boston, MA 02210; to **Edward Crooke**, Trial Attorney, Dept. Of Justice, Commercial Litigation – Fraud Division, 601 D. Street NW, Washington, D.C. 20004; to Assistant Attorney General **Christina Marie Burden**, Office of the Attorney General, 3507 East Frontage Road, Suite 325, Tampa, Florida 33607; to Assistant Attorney General **Greg T. Kinskey**, Office of the Attorney General, 300 West 15th Street, Austin, Texas 78701; to Assistant Attorney General **George Jepsen**, Office of the Attorney General, 55 Elm Street, Hartford, Connecticut 06106; to Attorney General **Kamala Harris**, Attorney General's Office, California Department of Justice, 1300 "I" Street, Sacramento, California 95814-2919; to Attorney General **John W. Suthers**, Colorado Department of Law, 1525 Sherman Street, Denver, Colorado 80203; to Attorney General **Joseph R. "Beau" Biden, III**, Carvel State Office Bldg., 820 N. French Street, Wilmington, Delaware 19801; to Attorney General **Sam Olens**, Office of

the Attorney General, 40 Capital Square, SW, Atlanta, Georgia 30334; to Attorney General **David Louie**, Department of the Attorney General, 425 Queen Street, Honolulu, Hawaii 96813; to Illinois Attorney General **Lisa Madigan**, 100 West Randolph Street Chicago, Illinois 60601; to Attorney General **Greg Zoeller**, Office of the Indiana Attorney General, Indiana Government Center South, 302 W. Washington Street, 5th Floor, Indianapolis, Indiana 46204; to Attorney General **James D. "Budy" Caldwell**, 1885 N. Third Street, Baton Rouge, Louisiana 70802; to Attorney General **Douglas F. Gansler**, Office of the Attorney General, 200 St. Paul Place, Baltimore, Maryland 21202; to Attorney General **Martha Coakley**, One Ashburton Place, Boston, Massachusetts 02108; to Attorney General **Bill Schuette**, Office of the Attorney General, G. Mennen Williams Building, 7th Floor, 525 W. Ottawa Street, G. Mennen Williams Building, 7th Floor, 525 W. Ottawa Street, Lansing, Michigan 48909; to Attorney General **Lori Swanson**, Office of the Minnesota Attorney General, 1400 Bremer Tower, 445 Minnesota Street, St. Paul, Minnesota 55101-2131; to Attorney General **Steve Bullock**, Department of Justice, 125 N. Sanders, Helena, Montana 59601; to Attorney General **Michael A. Delaney**, Department of Justice, 33 Capitol Street, Concord, New Hampshire, 03301; to Attorney General **Paula T. Dow**, Office of the Attorney General, Richard J. Hughes Justice Complex, 8th Floor, West Wing, 25 Market Street, Trenton, New Jersey, 08625-0080; to Attorney General **Gary King**, Office of the Attorney General, 408 Galisteo Street, Villagra Building, Santa Fe, New Mexico 87501; to Attorney General **Eric Schneiderman**, Office of the Attorney General, The Capitol, Albany, New York 12224-0341; to Attorney General **Roy Cooper**, Department of Justice, 9001 Mail Service Center, Raleigh, North Carolina, 27699-9001; to Attorney

General **Scott Pruitt**, 313 NE 21st Street, Oklahoma City, Oklahoma 73105; to Attorney General **Peter Kilmartin**, 150 South Main Street, Providence, Rhode Island 02903; to Attorney General and Reporter **Robert E. Cooper, Jr.**, Office of the Attorney General and Reporter, Cordell Hull Building, 425 5th Avenue North, Nashville, Tennessee 37243; to Attorney General **Kenneth T. Cuccinelli, II**, Office of the Attorney General, 900 East Main Street, Richmond, Virginia 23219; to Attorney General **J.B. Van Hollen**, Wisconsin Department of Justice, 114 East State Capitol, Madison, Wisconsin 53707-7857; to Acting Attorney General **Irvin Nathan**, Office of the Attorney General, 441 4th Street, NW, Suite 1145S, Washington, DC 20001 on this 19th day of July 2012.

Thomas N. Burnham
Michigan Bar P23311
Burnham International Law Office, PC
4140 Miller Road
Ann Arbor, Michigan 48103
Telephone: (941) 232-2039
tnburnham@earthlink.net
Counsel for *Qui Tam* Relators
Admitted Pro Hac Vice

Kevin J. Darken
Florida Bar No. 0090956
kdarken@tampalawfirm.com
THE COHEN LAW GROUP
201 East Kennedy Boulevard, Ste 1000
Tampa, Florida 33602
Telephone: (813) 225-1655
Facsimile: (813) 225-1921
Co-Counsel for *Qui Tam* Relators
Admitted Pro Hac Vice