## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

**UNITED STATES OF AMERICA, STATES OF
CALIFORNIA, COLORADO, CONNECTICUT,
DELAWARE, FLORIDA, GEORGIA, HAWAII,
ILLINOIS, INDIANA, IOWA, LOUISIANA, MARYLAND,
MASSACHUSETTS, MICHIGAN, MINNESOTA,
MONTANA, NEVADA, NEW HAMPSHIRE, NEW JERSEY,
NEW MEXICO, NEW YORK, NORTH CAROLINA,
OKLAHOMA, RHODE ISLAND, TENNESSEE,
TEXAS, VIRGINIA and WISCONSIN and the
DISTRICT OF COLUMBIA ex rel. ALEX BOOKER
and EDMUND HEBRON**

            **Plaintiffs**                **CASE NO. 1:10-CV-11166-DPW**

**v.**

**PFIZER, INC.**

            **Defendant**

_____/

## RELATORS' RESPONSE TO PFIZER'S MOTION TO
## DISMISS FIFTH AMENDED COMPLAINT

I.   **Pfizer's first-to-file bar argument is meritless because the plain language of this provision makes it applicable only when a prior qui tam action is "pending." The *Kruszewski* and *Westlock* cases were not pending when this case was filed in July 2010 as those actions had been settled in September 2009 and dismissed in December 2009 as part of Pfizer's $2.3 billion mega-settlement. In addition, the Congressional policy underlying Section 3730(b)(5) supports denying Pfizer's motion.**

The first-to-file bar of 31 U.S.C. § 3730(b)(5) states: "When a person brings an action under this subsection, no person other than the Government may intervene or bring a related action based on the facts underlying the ***pending*** action." (Emphasis added) The plain language of this provision means that the first-to-file bar applies only when a qui tam case is filed while another qui tam action is "pending"[1]:

- *United States ex rel. Bartz v. Ortho-McNeil Pharmaceutical, Inc.*, 856 F.Supp.2d 253, 269 (D. Mass. 2012) (Stearns, J.) (dismissing qui tam complaint where relator "argues, unpersuasively, that none of the cited first-filed cases were pending actions under § 3730(b)(5)" because "all were pending at the time Bartz filed this litigation");

- *United States ex rel. Carter v. Halliburton Co.*, 2013 U.S.App. LEXIS §309, *29 (4th Cir., March 18, 2013)("We agree that once a case is no longer pending the first-to-file bar does not stop a relator from filing a related case.   In this case, both of the original relators have been dismissed.  Because of this, the first-to-file bar does not preclude Carter from filing an action");

- *United States ex rel. Chovanec v. Apria Healthcare Group, Inc.*, 606 F.3d 361, 365 (7th Cir. 2010) ("§ 3730(b)(5) applies only while the initial complaint is 'pending'");

- *In re Natural Gas Royalties Qui Tam Litigation*, 566 F.3d 956, 964 (10th Cir. 2009) ("Section 3730(b)(5) applies only when another qui tam action

---

[1] Pfizer's reliance on *United States ex rel. Powell v. American InterContinental University, Inc.*, 2012 WL 2885356, *4-5 (N.D. Ga., July 12, 2012) is misplaced.  The *Powell* court erred by deciding that the purpose of the "pending" requirement in the first-to-file bar was to help determine "whether the Government already had notice of the claims and whether the related action should be barred." *Id.*  But as the Tenth Circuit has held, a notice-based standard is not consistent with the statutory language.  *Natural Gas Royalties*, 566 F.3d at 964 ("If the first-to-file bar had been meant simply as a more draconian public disclosure bar, Congress would not have limited it to 'pending' actions").  In addition, *Powell* "is factually distinguishable because the case dealt with identical violations" whereas " [i]n the instant case, Relators allege that fraud transpired after the settlement" of a prior qui tam case.  *United States ex rel. Hoggett v. University of Phoenix*, 2013 WL 875969, *4 (E.D. Cal., March 7, 2013).

is 'pending' .... [I]f that prior claim is no longer pending, the first-to-file bar no longer applies");

- *United States ex rel. Branch Consultants v. Allstate Insurance Co.,* 560 F.3d 371, 379 (5th Cir. 2009) ("as long as the later-filed complaint alleges the same material or essential elements of fraud described in a pending qui tam action, § 3730(b)(5)'s jurisdictional bar applies");

- *Walburn v. Lockheed Martin Corp.,* 431 F.3d 966, 972 n.5 (6th Cir. 2005) ("[T]he ultimate fate of an earlier-filed action does not determine whether it bars a later action under § 3730(b)(5); rather, the question is only whether the earlier action was 'pending' at the time the later action was filed.")

- *United States ex rel. Lujan v. Hughes Aircraft Co.,* 243 F.3d 1181, 1188 (9th Cir. 2001) ("Following § 3730(b)(5)'s plain language, Lujan's action is barred if she brought the claim while *Schumer* was pending"); and

- *United States ex rel. Hoggett v. University of Phoenix,* 2012 WL 2681817, *4 (E.D. Cal., July 6, 2012) ("Section 3730(b)(5) only applies when the initial complaint is pending .... Because § 3730(b)(5) only applies when the initial complaint is pending, it is immaterial that Relators' complaint is 'related' to the fraud alleged in *Hendow*");

As Pfizer well knows, the *Kruszewski* and *Westlock* cases were dismissed on December 22, 2009 pursuant to Pfizer's $2.3 billion settlement agreement. **Exhibits 1, 2 and 3.** Since the *Kruszewski* and *Westlock* cases were dismissed on December 22, 2009, neither of those cases was "pending" when this case was filed in July 2010.[2] *Lujan,* 343 F.3d at 1188; *United States ex rel. Shea v. Verizon Business Network Services, Inc.,* 2012 WL 5554792, *5 (D.D.C., November 15, 2012). Accordingly, neither the *Kruszewski* case nor the *Westlock* case qualifies as a "pending action" which causes the first-to-file bar to be applicable in this case. *Hoggett,* 2012 WL 2681817 at *4 (denying motion to dismiss on first-to-file grounds because "[i]n the instant case, *Hendow* was dismissed before Relators brought their suit, and, therefore, was not 'pending' under §

---

[2] Pfizer's reliance on *United States ex rel. Batiste v. SLM Corp.,* 659 F.3d 1204, 1206-1207 (D.C. Cir. 2011), therefore, is misplaced because in that case Relator Batiste filed his complaint in June 2008 prior to Relator Zahara's complaint being dismissed in March 2009.

3730(b)(5)").    Thus, the plain language of Section 3730(b)(5) refutes Pfizer's argument[3].

II.     **The public disclosure bar does not apply here because the *Kruszewski* and *Westlock* complaints did not disclose Pfizer's continuing off-label promotion of Geodon following its $2.3 billion settlement in September 2009. And, even if the *Kruszewski* and *Westlock* complaints constitute public disclosures under Section 3730(e)(4)(A), both Relator Booker and Relator Hebron qualify as original sources.**

A.     **There was no public disclosure in the *Kruszewski* and *Westlock* complaints of Pfizer's continuing off-label promotion of Geodon following its $2.3 billion settlement in September 2009.**

The first question asked in the First Circuit's public disclosure bar analysis is "whether there has been public disclosure of the allegations or transactions in the relators' complaint." *United States ex rel. Ondis v. City of Woonsocket*, 587 F.3d 49, 53 (1st Cir. 2009).   The central allegation of this complaint is that Pfizer continued to illegally promote Geodon (and Pristiq) for off-label purposes even after its $2.3 billion settlement in September 2009.    That fact was not (and logically could not be) disclosed in the *Kruszewski* and *Westlock* complaints because those complaints were settled as part of the $2.3 billion settlement and did not concern Pfizer's post-settlement conduct.

To constitute a public disclosure of the allegations or transactions in a relators' complaint, "the disclosure must reveal both the misrepresented state of facts and the true state of facts so that the inference of fraud may be drawn." *Id.* at 54.   Here, the misrepresented state of facts is that Pfizer was falsely pretending to both the Department of Justice and to the Office of Inspector General of the Department of Health and Human

---

[3] Moreover, the primary legislative purpose behind Section 3730(b)(5) "is to encourage whistleblowers to come forward, while at the same time discouraging opportunistic or parasitic lawsuits." *Hoggett,* 2012 WL 2681817, *4.  In this case, however, "[u]sing the first-to-file rule to bar whistleblower suits that allege new fraud committed by a wrongdoer after completion of a previous suit would thwart the statute's purpose to encourage whistleblowers to come forward." *Id.* Furthermore, if the allegations in this complaint are true and Pfizer is "perpetrating a fraud similar to the fraud that it previously perpetrated against the government, then there is nothing opportunistic or parasitic about bringing this suit." *Id.*

Services that it had stopped illegally promoting Geodon for off-label purposes following the $2.3 billion settlement. The true state of facts in this complaint is that Pfizer was continuing to illegally promote Geodon for off-label purposes even after and notwithstanding the $2.3 billion settlement. Neither the misrepresented state of facts nor the true state of facts in this complaint are contained in the *Kruszewski* or the *Westlock* complaints. Consequently, neither of those complaints constitutes a public disclosure of the allegations or transactions in this complaint.

"[W]here only one element of the fraudulent transaction is in the public domain (e.g., X), the qui tam plaintiff may mount a case by coming forward with either the additional elements necessary to state a case of fraud (e.g., Y) or allegations of fraud itself (e.g., Z)." *United States ex rel. Springfield Terminal Railway Co. v. Quinn,* 14 F.3d 645, 655 (D.C. Cir. 1994), *cited in Ondis, supra,* at 54. Here, the fact that Pfizer had illegally promoted Geodon for off-label purposes in years prior to 2008 was publicly disclosed in the $2.3 billion settlement agreement. However, the public disclosure bar does not preclude Relators Booker and Hebron from bringing a case by coming forward with the additional element that Pfizer chose to continue to illegally promote Geodon for off-label purposes even after and in notwithstanding of the $2.3 billion settlement.

In addition, the legislative policy underlying the public disclosure bar does not support applying that bar here because the public disclosure bar should be applied only when the disclosure is "adequate to set the government squarely on the trail of fraud." *In re Pharmaceutical Industry Average Wholesale Price Litigation,* 538 F.Supp.2d 367, 387 (D. Mass. 2008) (Saris, J.). Here, however, nothing in the *Kruszewski* or *Westlock* complaints put the Government on notice that Pfizer would be continuing to illegally promote Geodon for off-label purposes even after paying the then-largest FCA settlement

4

in history and entering into yet another corporate integrity agreement with the HHS Office of Inspector General.

In the analogous case of *United States ex rel. Robinson-Hill v. Nurses Registry and Home Health Corp.*, 2012 WL 4598699, *13 (E.D. Ky., October 2, 2012), the court declined to dismiss the Government's complaint-in-intervention on public disclosure grounds where "[t]he qui tam complaint alleges, in part, the exact same conduct that the Government alleged in the 2005 Settlement Agreement" but the relators "allege[d] that Nurses' Registry continued to upcode even after the 2005 Settlement Agreement." Just as Pfizer contends, "Nurses' Registry contend[ed] that the 2005 Settlement Agreement put the Government squarely on the trail of the fraud alleged in the qui tam complaint, because the Settlement Agreement bound Nurses' Registry to end its past practices and to refrain from upcoding in the future." *Id.* However, "[t]he Government contests this argument and states that nothing in the Settlement Agreement put it on notice that Nurses' Registry would be a repeat offender." *Id.*

So too in this case. Nothing in the *Kruszewski* complaint, the *Westlock* complaint, or the $2.3 billion settlement agreement put the Government on notice that Pfizer would be a repeat offender by continuing to illegally promote Geodon for off-label purposes within weeks of the settlement. Therefore, the Court should follow the *Nurses' Registry* court's decision in denying Pfizer's motion to dismiss on public disclosure grounds.

      **B.**      **Even if the *Kruszewski* and *Westlock* complaints constitute public disclosures under Section 3730(e)(4)(A), both Relator Booker and Relator Hebron qualify as original sources.**

             **1.**      **Relators Booker and Hebron did disclose their Geodon allegations to the Government prior to filing suit and, therefore, qualify as original sources.**

Contrary to Pfizer's key factual contention, Relators Booker and Hebron **_did_** disclose their Geodon allegations to the Government prior to filing their original complaint; prior to filing their First Amended Complaint; prior to filing their Second Amended Complaint; and prior to filing their Third Amended Complaint, as is stated in each of those complaints on file in this case.

In considering a motion to dismiss, the court may consider "facts … susceptible of judicial notice," *United States ex rel. Conrad v. Healthpoint, Ltd.,* 2012 WL 1004775, *2 (D. Mass., March 26, 2012) (Zobel, J.) and "matters of which judicial notice can be taken." *United States v. Infomedics,* 847 F.Supp.2d 256, 261 (D. Mass. 2012) (Gorton, J.). In particular, district judges are permitted to take judicial notice of pleadings filed **in their own court** when deciding motions to dismiss qui tam cases on public disclosure grounds. *United States ex rel. Karvelas v. Melrose-Wakefield Hospital,* 2003 WL 21228801, *3 (D. Mass., May 21, 2003) (Woodlock, J.) ("I have taken judicial notice of actions reflected in the files of this court regarding *Karvelas I*"); *United States ex rel. Kinney v. Stoltz,* 2002 WL 523869, *4 (D. Minn., April 5, 2002) ("The Court can clearly take judicial notice of the Orders it issued in *Kinney I,* the pleadings therein, and the motion papers filed with the Court by the parties").

Therefore, the Court can and should take judicial notice of the fact that Relators' original complaint, First Amended Complaint, Second Amended Complaint and Third Amended Complaint all recite that "a statement of all material evidence and information" was provided to the Department of Justice prior to each of those complaints being filed.

### 2.  Relators Booker and Hebron qualify as original sources under the amended Section 3730(e)(4)(B)(2).[4]

---

[4] Pfizer concedes that the amended version of the public disclosure bar applies to conduct occurring after March 23, 2010. Footnote 7 of Pfizer's Motion to Dismiss ("Although the prior version of the public disclosure bar applies to conduct before March 23, 2010 …."). The original complaint in this case was

The amended version of the public disclosure bar defines "original source" as including an individual "who has knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions, and who has voluntarily provided the information to the Government before filing an action under this section." 31 U.S.C. §3730(e)(4)(B)(2).  The knowledge shared by Relators Booker and Hebron that Pfizer was continuing to illegally promote Geodon for off-label purposes within weeks of the $2.3 billion settlement constitutes knowledge that is independent of and materially adds to the publicly disclosed allegations in the *Kruszewski* and *Westlock* complaints. *Hoggett,* 2012 WL 2681817 at *4 ("Here, Relators allege that while UOPX [University of Phoenix] has ostensibly changed its procedures to comply with federal regulations, they have knowledge that UOPX has continued to perpetrate a fraud on the government even after the *Hendow* [qui tam] case was completed.  If, as Relators allege, the new procedures cover up a continuation of the previous fraud, then Relators have provided information that is independent of and materially adds to the information publicly disclosed during the *Hendow* case").

Put another way, the knowledge shared by Relators Booker and Hebron that Pfizer was continuing to illegally promote Geodon for off-label purposes immediately after the $2.3 billion settlement was information which "adds value" to the prior disclosures in the *Kruszewski* and *Westlock* complaints.  Therefore, Relators Booker and Hebron qualify as original sources under the amended version of the public disclosure

---

filed in July 2010 which is after March 23, 2010. Moreover, the original complaint and all amended complaints allege that Pfizer illegally promoted Geodon for off-label purposes "to the present" on a continuing and ongoing basis. Consequently, the amended version of the public disclosure bar should be applied here. *See United States ex rel. Zizic v. Q2 Administrators, LLC,* 2012 WL 1019047, *5 n.2 (E.D. Pa., March 27, 2012) (applying old version of public disclosure bar "[b]ecause the Zizic action was pending at the time of amendment" on March 23, 2010).

bar. *United States ex rel. Davis v. District of Columbia,* 679 F.3d 832, 839 n.4 (D.C. Cir. 2012) (characterizing the Congressional policy behind the amended public disclosure bar as being "to provide incentives to only those relators whose information adds value").

### 3. Relator Booker also qualifies as an original source under the pre-amendment version of Section 3730(e)(4)(B).

"Original source" is defined in pre-amendment Section 3730(e)(4)(B) as "an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information." As stated above, Relators Booker and Hebron provided their information to the Government prior to the filing of their original complaint. That is sufficient to meet the "voluntarily provided" part of the original source definition. *United States ex rel. Duxbury v. Ortho Biotech Products, L.P.,* 579 F.3d 13, 28 (1st Cir. 2009).

Relator Booker has both direct and independent knowledge of Pfizer's continuing illegal promotion of Geodon for off-label purposes after December 31, 2007, the end of the "Covered Conduct" period for Geodon in the $2.3 billion settlement agreement, and after the September 2009 settlement agreement. *United States ex rel. Nowak v. Medtronic, Inc.,* 806 F.Supp.2d 310, 333 (D. Mass. 2011) (Woodlock, J.) (holding relator Nowak to be an original source because "she refers to specific emails, conversations, meetings, promotional materials, and sales reports to support her allegations" which "she collected as a Medtronic sales representative and not from public disclosures or another source"); *United States ex rel. Hutcheson v. Blackstone Medical, Inc.,* 694 F.Supp.2d 48, 60 (D. Mass. 2010) (Young, J.), *reversed on other grounds,* 647 F.3d 377 (1st Cir. 2011) (finding that a relator was an original source because, as the defendant's employee, "she

observed [the defendant's] business practices[,] … was privy to meetings, conversations, and other internal communications[, and] … had access to email and internal documents and data which reflected the conduct discussed in the complaint").

### 4. Relator Hebron also qualifies as an original source under the pre-amendment version of Section 3730(e)(4)(B).

Relators Hebron and Booker "undertook a joint investigation and functioned as a single disquisitive 'agent'". *United States ex rel. Atkinson v. Pennsylvania Shipbuilding Co.,* 255 F.Supp.2d 351, 377 (E.D. Pa. 2002). "During the course of this inquiry, both [relators] obtained information on which their joint claims were at least partially based." *Id.* As "an integral participant in the collaborative investigation," Relator Hebron "simply cannot be considered a 'disinterested outsider,' nor can his suit be considered 'parasitic.'" *Id.* In this context, the knowledge gained directly and independently by Relator Booker may also be said to have been learned directly and independently by Relator Hebron. *Id.* ("I conclude that knowledge gained directly and independently by a relator in the course of a joint investigation may also be said to have been learned directly and independently by his co-relator"). Therefore, Relator Hebron also qualifies as an original source under the pre-amendment version of Section 3730(e)(4)(B).

### III. Relators have adequately pled that claims submitted to federal payors were ineligible for reimbursement and, therefore, false or fraudulent claims.

#### A. Federal statutes limit Medicaid and Medicare reimbursements only to "covered outpatient drugs," a category which does not include Geodon or Pristiq when promoted illegally for off-label purposes.

Congress has limited Medicaid reimbursement for prescription drugs to only "covered outpatient drugs." 42 U.S.C. § 1396r-8(a)(1); 42 U.S.C. § 1396b(i)(10). Under 42 U.S.C. 1396r-8(k)(3), a "covered outpatient drug" does not include a drug used for a

medical indication which is not a "medically accepted indication."  But under 42 U.S.C.

§ 1396r-8(k)(6), "medically accepted indication" includes only off-label uses "supported

by one or more citations included or approved for inclusion in any of [three specified]

compendia."   Therefore, an off-label use not supported by any of the specified

compendia, such as off-label uses of Geodon and Pristiq, is not a "medically accepted

indication."[5]  Because such off-label use is a use "for a medical indication which is not a

medically accepted indication," the drug prescribed is not a "covered outpatient drug" and

is, therefore, not eligible for Medicaid and Medicare reimbursement under federal law.

     The First Circuit and many other courts correctly hold that prescriptions for the

off-label use of drugs such as Geodon and Pristiq which are not supported by any of the

three specified compendia are not eligible for reimbursement under the Medicaid and

Medicare programs:

- *United States ex rel. Rost v. Pfizer, Inc.,* 507 F.3d 720, 723 and n.1 (1st Cir. 2007) ("Medicaid generally does not reimburse patients for off-label prescriptions … Medicaid reimbursement is available for certain off-label uses that are medically 'essential' or recognized within one of several medical compendia").

- *United States ex rel. Carpenter v. Abbott Laboratories, Inc.,* 723 F.Supp.2d 395, 409 (D. Mass. 2010) (Stearns, J.) ("Whether a drug is FDA-approved for a particular use will largely determine whether a prescription for that use of the drug will be reimbursed under the federal Medicaid program.  Reimbursement under Medicaid is, in most circumstances, available only for 'covered outpatient drugs.' 42 U.S.C. § 1396b(i)(10).  Covered outpatient drugs do not include drugs

---

[5]  "Medicare outpatient prescription drug benefits have the same 'medically accepted indication' requirement." *United States ex rel. Carpenter v. Abbott Laboratories, Inc.,* 723 F.Supp.2d 395, 409 (D. Mass. 2010) (Stearns, J.) (*citing* 42 U.S.C. § 1395w-102(e), which defines a "covered part D drug" as "any use of a covered part D drug for a medically accepted indication" as that term is defined in 42 U.S.C. § 1396r-8(k)(6)). "A specific off-label use for a drug is eligible for reimbursement by Medicare only if that indication is 'medically accepted', 42 U.S.C. § 1395x(t)(2)(B).  An off-label use is medically accepted if it is supported by a citation in any of three specified drug compendia published by third parties. 42 U.S.C. § 1395x(t)(2)(B)(ii)(I)." *United States ex rel. Marchese v. Cell Therapeutics, Inc.,* 2007 WL 4410255, *1 (W.D. Wash., December 14, 2007). The *Layzer* case relied on by Pfizer was recently rejected by *Nievod v. Sebellius,* 2013 WL 503089 (N.D. Cal., Feb. 13, 2013) ("the Court concludes that it is clear from the plain terms of the statute that a covered Part D drug is one that comports with the medically accepted indication requirement…. [T]he Court respectfully declines to follow *Layzer*"). *Id.* at *9 and n.4.

that are 'used for a medical indication which is not a medically accepted indication.' *Id.* § 1396r-8(k)(3). A medically accepted indication, in turn, includes a use 'which is approved under the Federal Food, Drug and Cosmetic Act' or which is included in specified drug compendia. *Id.* § 1396r-8(g)(1)(B)(i) (identifying compendia to be consulted). Thus, unless a particular off-label use for a drug is included in one of the identified drug compendia, a prescription for the off-label use of that drug is not eligible for reimbursement under Medicaid"), *quoting United States ex rel. Franklin v. Parke-Davis, Division of Warner-Lambert Co.,* 147 F.Supp.2d 39, 44-45 (D. Mass. 2001) (Saris, J.).

- *United States ex rel. Poteet v. Lenke,* 604 F.Supp.2d 313, 316 N.3 (D.Mass. 2009)(Stearns, J.)("the federal government discourages off-label prescription use… by restricting Medicaid from reimbursing healthcare providers for off-label uses").

- *United States ex rel. Polansky v. Pfizer, Inc.,* 2012 WL 5595933, *1 and n.1 (E.D.N.Y., November 15, 2012) ("Since Medicare and Medicaid do not reimburse off-label prescriptions, plaintiff contends the claims submitted as a result of defendant's conduct constitute violations of the False Claims Act…. Reimbursement under Medicaid is substantially limited to 'covered outpatient drugs' which do not include drugs 'used for a medical indication which is not a medically accepted indication.'").

- *United States ex rel. Watson v. King-Vessel,* 2012 WL 5272486, *5 (E.D. Wis., October 23, 2012)( "A ' false or fraudulent claim' occurs when Medicaid pays for drugs that are not used for an indication that is either approved by the Food, Drug, and Cosmetic Act or supported by a drug compendia").

- *United States ex rel. Bennett v. Boston Scientific Corp.,* 2011 WL 1231577, *5 (S.D. Tex., March 31, 2011) ("Medicare and Medicaid typically do not reimburse off-label prescriptions for drugs").

- *United States ex rel. West v. Ortho-McNeil Pharmaceutical, Inc.,* 2007 WL 2091185, *2 (N.D. Ill., July 20, 2007) ("Moreover, Medicaid generally reimburses providers only for 'covered outpatient drugs.' 42 U.S.C. § 1396b(i)(10), 1396r-8(a)(3). 'Covered drugs' do not include drugs 'used for a medical indication which is not a medically accepted indication.' 42 U.S.C. § 1396r-8(k)(3). A medically accepted indication is one 'approved under the Federal Food, Drug and Cosmetic Act' or one included in certain, specified drug compendia").

      **B.**    **Pfizer's off-label promotion of Geodon and Pristiq constitutes misbranding crimes under the Food, Drug and Cosmetics Act. Consequently, Congress cannot have intended that the claims Pfizer caused by its criminal promotion would be paid with government funds.**

"Promoting an off-label use of a drug renders it misbranded." *United States v. Harkonen,* 2009 WL 1578712, *1 (N.D. Cal., June 4, 2009)[6]. Introducing into commerce "any food, drug, device, tobacco product or cosmetic that is adulterated or misbranded" is a crime under 21 U.S.C.§331(a) and §333.[7] Pfizer's criminal misbranding conduct in violation of the Food, Drug and Cosmetics Act is analogous to Pfizer paying physicians kickbacks in violation of the Anti-Kickback Act to prescribe Geodon and Pristiq because in both situations Pfizer committed federal crimes in order to cause doctors to write prescriptions, which ended up being paid for by Medicaid and Medicare.

The Anti-Kickback Act protects the public from kickbacks that "are designed to influence providers' independent medical judgment." *United States ex rel. Westmoreland v. Amgen, Inc.,* 812 F.Supp.2d 39, 53 (D. Mass. 2011) (Young, J.). Similarly, the "primary purpose" of the criminal misbranding statute is "to prevent injury to the public health," *United States v. Forty Barrels and Twenty Kegs of Coca-Cola,* 241 U.S. 265, 277 (1916), which in the off-label promotion context means precluding companies like Pfizer from influencing physicians' independent medical judgment to get them to prescribe drugs for off-label uses.

The Anti-Kickback Act and the criminal misbranding statute are alike in another way. "Those convicted under the AKS [Anti-Kickback Statute] are barred from participating in the federal health care program." *United States ex rel. Bidani v. Lewis,*

---

[6] *See also United States v. Caputo,* 288 F.Supp.2d 912, 920 (N.D.Ill. 2003) ("promoting off-label uses makes [a product] misbranded"). Pfizer's reliance on the Second Circuit's recent *Caronia* decision is misplaced because the *Caronia* court only "construe[d] the misbranding provisions of the FDCA as not prohibiting and criminalizing the *truthful* off-label promotion of FDA-approved prescription drugs." 763 F.3d at 168 (emphasis added). In this case, however, as discussed in detail in Sections IV and V below, Pfizer engaged in untruthful, misleading, and fraudulent off-label promotion. Consequently, *Caronia* is factually not applicable to this case. Moreover, *Caronia* has not been adopted by any other court.

[7] Misdemeanor misbranding is a strict liability crime, which requires no proof of criminal intent. *United States v. Dotterweich,* 320 U.S. 277, 281 (1943); *United States v. Watkins,* 278 F.3d 961, 964 (9th Cir. 2002).

264 F.Supp.2d 612, 615 (N.D. Ill. 2003). So too are those convicted of even misdemeanor misbranding. *Friedman v. Sebelius*, 686 F.3d 813 (D.C. Cir. 2012). The fact that kickback violations merit exclusion from federal health care programs proves that "the government will not pay kickback-tainted claims" because "[p]reservation of the public fisc would be undermined if a provider could engage in conduct warranting exclusion from the program altogether yet still demand payment until the time of formal exclusion." *Id.* at 50, 56. So too with misbranding crimes.

As Judge Young observed, "Congress cannot have intended that those brazen enough to violate the Anti-Kickback Statute (thereby risking criminal penalties) … would have their claims for Medicare payment paid with government funds." *Westmoreland*, 812 F.Supp.2d at 51. So too Congress cannot have intended that a pharmaceutical manufacturer like Pfizer, brazen enough to commit misbranding crimes within months of the $2.3 billion settlement, would be able to continue to promote the sale of its drugs off-label by having prescriptions for those drugs paid for by Medicaid and Medicare. Just as "[r]eimbursing a claimant for the supplies [purchased through a kickback-induced transaction] would put the government in the position of funding illegal kickbacks after the fact," *Bidani*, 264 F.Supp.2d at 616, so too Medicaid and Medicare reimbursements for drugs Pfizer illegally promoted for off-label purposes would put those programs in the untenable position of funding Pfizer's continued criminal misbranding after the fact. Just as "[i]f providers could demand payment for claims resulting from kickback violations, then the Anti-Kickback Statute would be meaningless legislation," *Westmoreland*, 812 F.Supp.2d at 53-54, so too if claims resulting from misbranding crimes are not ineligible for payment under the Medicaid and Medicare programs, then the misbranding statute will be rendered toothless in its ability to protect American patients.

Numerous global settlement agreements of criminal misbranding prosecutions against pharmaceutical manufacturers prove that just as the government will not pay kickback-tainted claims, so too the government will not pay claims resulting from misbranding crimes.[8] Pfizer well understood the government's policy against paying claims resulting from misbranding due to its September 2009 settlement agreement, attached as **Exhibit 3**.  In that settlement, Pfizer agreed to pay $668.5 million to the United States and $331.4 million to the "Medicaid Participating States" to settle nine FCA cases alleging illegal promotion of Bextra, Geodon, Zyvox, and Lyrica for off-label conditions and for not medically-accepted indications which knowingly caused false or fraudulent claims to be submitted to Medicaid, Medicare and other federal health care programs.

Relators are not required to plead that any particular statute, regulation policy, or certification prohibits Medicare and Medicaid reimbursement of claims induced by misbranding. *United States ex rel. Hutcheson v. Blackstone Medical, Inc.,* 647 F.3d 377, 391 (1st Cir. 2011); *Westmoreland,* 812 F.Supp.2d at 56.  It is sufficient that Pfizer knew Medicare and Medicaid programs would not knowingly reimburse for claims resulting from misbranding. *United States v. Bradley,* 644 F.3d 1213, 1242 n.64 (11th Cir. 2011) ("we disagree with Bio-Med's contention that it was permitted to resell recycled blood-

---

[8] *See* 2012 DOJ press release attached as **Exhibit 4** announcing $201.9 million paid to "participating Medicaid states" as part of Merck's Vioxx misbranding guilty plea and global settlement; *In re Zyprexa Products Liability Litigation,* 671 F.Supp.2d 397, 406 (E.D.N.Y. 2009) (discussing $362 million paid by Eli Lilly & Co. as part of Lilly's Zyprexa misbranding guilty plea "to compensate settling states for amounts paid out of state funds for Zyprexa"); *United States v. Purdue Frederick Co., Inc.,* 495 F.Supp.2d 569, 572 (W.D. Va. 2007) (discussing "civil settlements" of $59.3 million to various states and $100.6 million to federal health care agencies made as part of Purdue's OxyContin misbranding guilty plea); 2004 DOJ press release attached as **Exhibit 5** announcing $68.4 million paid to states "for losses the state Medicaid programs suffered as a result of Warner-Lambert's fraudulent drug promotion and marketing misconduct" as part of Warner-Lambert's Neurontin misbranding guilty plea). These payments to state Medicaid programs would make no sense if claims to Medicaid programs caused by misbranding did not constitute false or fraudulent claims.

derivatives in the absence of an express written regulation forbidding it. If Bio-Med knew that its conduct would cause the Medicaid programs to reimburse for medication they did not intend to cover, that was enough" to make these claims fraudulent).

### C. Pfizer's reliance on *United States ex rel. Banigan v. Organon USA Inc.*, 883 F.Supp.2d 277 (D. Mass. 2012) (Zobel, J.) is misplaced.

Judge Zobel's analysis "assumes that state Medicaid programs have the discretion to cover reimbursement for off-label use of a drug that is not supported by a citation in a medical compendium listed in the Medicaid statute" and concedes that "whether the Medicaid statute authorizes such discretion is up for debate." *Banigan*, 883 F.Supp.2d at 294. But the First Circuit held in the 2007 *Rost* case that Medicaid reimbursement is available under federal law only "for certain off-label uses that are medically 'essential' or recognized within one of several medical compendia." *Rost*, 507 F.3d at 723 and n.1. Therefore, Judge Zobel's assumption is contrary to First Circuit precedent and her conclusion should not be followed by this Court.

Moreover, Judge Zobel based her ruling on the fact that "Relators do not allege … that any state denies Medicaid coverage for an off-label prescription not included in a medical compendium" and "[n]or do they allege that states must deny coverage of such prescriptions under the Medicaid statute." *Banigan*, 883 F.Supp.2d at 295. But in this case, Relators Booker and Hebron allege clearly in Paragraph 31 that "the off-label uses of Geodon and Pristiq promoted by Pfizer were not eligible for reimbursement from Medicaid because the off-label uses promoted by Pfizer were neither listed in the labeling approved by the FDA nor included in the drug compendia specified by the Medicaid statute." This case is clearly distinguishable from *Banigan s*ince the key factual predicate

underlying Judge Zobel's analysis is not present here.  Therefore, Judge Zobel's conclusion should not be followed by this Court.

Whether or not Judge Zobel's assumption that state Medicaid programs have the discretion to reimburse for off-label uses of drugs is correct, nothing in 42 U.S.C. § 1396r gives states the discretion to reimburse for off-label uses of drugs that are the result of criminal misbranding.  The fact that some states choose to reimburse for off-label uses of Geodon or Pristiq when a physician decides on his or her own to prescribe those drugs does NOT mean that those states have chosen, or have the legal authority to choose, to reimburse for off-label uses of those drugs *when those prescriptions are the result of criminal misbranding by the pharmaceutical manufacturer.*  Judge Zobel's analysis, however, conflated these two separate issues, which then caused her to reach her erroneous conclusion.

To paraphrase Judge Young's conclusion in *Westmoreland,* Congress cannot have intended that pharmaceutical manufacturers brazen enough to violate the criminal misbranding statute would be able to get prescriptions for the drugs they promoted as part of their criminal conduct paid for by Medicare and Medicaid.   Judge Zobel missed this central point.  Consequently, her analysis should not be applied here.

### D.  Pfizer's reliance on *New York v. Amgen,* 652 F.3d 103, 111 (1st Cir. 2011) is also misplaced.

In *New York v. Amgen,* the First Circuit looked to each state's Medicaid programs to determine whether claims submitted to seven state Medicaid programs misrepresented compliance with a condition of payment recognized by those particular programs.  It did so because the relator and the state intervenors "do not assert that the federal government conditions funding to state Medicaid programs on the requirement that these programs

refuse to pay claims affected by kickbacks." *Amgen,* 652 F.3d at 111 n.9. Here, however, Relators Booker and Hebron have alleged that the federal Medicaid statute prohibits state Medicaid programs from reimbursing for off-label uses of Geodon and Pristiq promoted by Pfizer.

The First Circuit had to look to each state's Medicaid programs in *Amgen* because the federal Medicaid statute did not prohibit reimbursement of kickback-induced claims. Here, however, the federal Medicaid statute does prohibit reimbursement for drugs prescribed for off-label purposes not supported by any of the specified compendia.

### E. The Court should not decide this issue now at the motion to dismiss stage.

In *United States ex rel. Carpenter v. Abbott Laboratories, Inc.,* 723 F.Supp.2d 395, 410 (D. Mass. 2010), Judge Stearns confronted a similar argument raised by Abbott Labs at the motion to dismiss stage in an off-label promotion FCA case. Abbott contended that because a drug appeared on the Massachusetts Drug List as not requiring prior authorization for reimbursement, it was impossible for false claims to be submitted for that drug in Massachusetts. Judge Stearns denied Abbott's motion to dismiss on this ground because he "believe[d] it is unnecessary to address the effect of pre-authorization at this stage of the litigation." *Id.*

This Court should adopt Judge Stearns' position. Relators should be given the opportunity to prove that neither Medicare nor state Medicaid programs will knowingly pay for claims that are the result of criminal misbranding by pharmaceutical manufacturers. Then the Court can revisit this issue at the summary judgment stage with

the benefit of an evidentiary record[9]. Moreover, doing this will give the Government and the Plaintiff States time to weigh in on this issue, if they choose to do so.

**IV.** **Even if the claims Pfizer caused to be submitted to Medicare and Medicaid were not ineligible for reimbursement, Relators have still met the Rule 12(b)(6) standard because the complaint adequately alleges that Pfizer engaged in a fraudulent course of conduct to promote Geodon and Pristiq by concealing and misrepresenting known safety risks of both drugs.**

Pfizer had a duty to disclose information regarding the lack of safety or efficacy of Geodon and Pristiq for off-label uses which "arose because Pfizer was marketing the drug[s] for unapproved uses by disclosing positive information about the drug[s] while suppressing negative information in its possession." *In re Neurontin Marketing and Sales Practices Litigation,* 2011 WL 3852254, *47 (D. Mass., August 31, 2011) (Saris, J.). As Judge Saris explained, "intentionally suppress[ing] material negative information" about a drug's safety or efficacy renders the manufacturer's positive statements about the drug's safety and efficacy for off-label purposes "misleading and factually false." *Id.* at 82-83.

Pfizer violated its duty regarding Geodon "by making misleading statements to physicians based on misrepresentations of multiple clinical studies and by failing to provide the sales reps or their targeted physicians with proper, effective and transparent information regarding multiple safety issues that Pfizer was aware of but intentionally chose not to properly convey." Para. 56. Specifically, Pfizer trained its reps to omit

---

[9] For example, certain states explicitly prohibit Medicaid reimbursement for other than "medically accepted indications" as defined in 42 U.S.C. § 1396r-8(k)(6). *See* New Jersey Administrative Code § 10:51-2.10(b) (defining covered pharmaceutical services under New Jersey Medicaid as including "prescribed legend drugs (for their medically accepted indication) as defined in Section 1927(k)(6) of Social Security Act"); *Chappell v. Rhode Island Department of Human Services,* 2003 WL 21297134, *5 (R.I. Super.Ct., May 28, 2003) ("The more reasonable construction of 42 U.S.C. § 1396r-8(k)(6) is that Congress intended the first half of the sentence to mean that all FDA approved *uses* for a particular covered outpatient drug equal a medically accepted indication, while the second half of the sentence indicates an alternative procedure for reaching the same result.... Specifically, an off-label use for a drug will equal a medically accepted indication if it is 'supported by one or more citations [in the specified compendia]'").

negative information when discussing clinical studies (Paras. 57d, 57e) and to "not present any safety issues" (Para. 57e). Most strikingly, Pfizer concealed from its sales reps both the FDA committee vote rejecting Geodon's safety for the treatment of mania in pediatric patients ages 10-17 and "any of the safety problems identified by the FDA resulting from children and adolescents using Geodon", as well as concealing from physicians that the FDA had denied Pfizer's application to add an indication for Geodon's use in children and adolescents. Paras. 68c, 68m, 66f and Complaint Ex. 23.   Moreover, Pfizer directed its reps to tell doctors to manage side effects of Geodon by increasing the dose despite the fact that Pfizer "lacked any clinical data to support these factual assertions". Para. 71b. Pfizer violated its duty regarding Pristiq by failing to direct its reps to mention any of the substantially increased side effects of using Pristiq at doses greater than 50 mg while deliberately promoting the 100 mg dosage. Paras. 84, 85-102.

FCA complaints based on similar allegations have survived motions to dismiss. *United States ex rel. Ruhe v. Masimo Corp.,* 2012 WL 7681937, *2 (C.D. Cal., July 9, 2012) ("Relators allege that Masimo made false statements that its devices were effective," whether the complaint described systemic actions to misrepresent efficacy of devices); *United States ex rel. Dickson v. Bristol Myers Squibb Co.,* 2013 WL 360299, *2 (C.D. Ill., 2013) (defendant alleged to have "fraudulently downplayed and misrepresented specific and known health risks of Plavix use," where "Relator alleges defendants instructed their sales force to present various data and studies in a manner designed to confuse physicians and make them believe that Plavix was more effective than cheaper alternatives").

**V.      The FDA did not approve the 100 mg dose of Pristiq.**

The FDA approved Pristiq "for use as recommended in the enclosed agreed-upon labeling text." February 29, 2008 FDA Approval Letter at p.1, attached as **Exhibit 6**. The only "recommended dose" in the FDA-approved Pristiq label is "50 mg once daily with or without food." **Exhibit B to Pfizer Motion**. As Dr. Philip Ninan, Wyeth's Vice President of Medical Affairs, Neuroscience said in Wyeth's press release announcing the FDA's approval of Pristiq, "Pristiq is approved at a once-daily 50 mg dose...." **Exhibit 7**.

"After extensive testing, the FDA will approve a pharmaceutical drug for one or more specific uses and will establish a recommended dosage for those uses. Use of an approved drug for any purposes other than those specifically approved by the FDA is referred to as an 'off-label' use." *United States ex rel. Rost v. Pfizer, Inc.*, 446 F.Supp.2d 6, 9 (D. Mass. 2006) (Tauro, J.), *affirmed in part and vacated in part*, 507 F.2d 720 (1st Cir. 2007). The FDA considers promoting use of a drug at a dose higher than the recommended dose to be illegal off-label promotion. *Carr-Davis v. Bristol-Myers Squibb Co.*, 2009 WL 5206122, *2 (D.N.J., December 30, 2009) ("Plaintiff also points to the same FDA reprimand wherein Defendants were instructed to cease promoting Plavix at an off-label dose, which was nearly four times that of the recommended dose. In addition to criticizing Defendants for promoting Plavix for unapproved use, the FDA also criticized Defendants for overstating the safety profile of Plavix") (emphasis added).

The FDA-approved Pristiq label notes in Paragraph 2.1 that in clinical trials "no additional benefit was demonstrated at doses greater than 50 mg/day and adverse events and discontinuations were more frequent at higher doses." **Ex. B to Pfizer Motion**. In spite of those facts well-known by Pfizer, Pfizer directed its reps to promote Pristiq, including by promoting a study in which patients took Pristiq "at 4-8 times the

recommended 50-mg dose", without "mention[ing] any of these substantially increased side effects to physicians." Complaint Paras. 91, 100, 101 and Complaint Ex. 45. By so doing, Pristiq engaged in fraudulent off-label promotion of Pristiq. *Neurontin*, 2011 WL 3852254 at * 26-27 (describing four methods by which Pfizer "engaged in fraudulent marketing of Neurontin at doses greater than [the FDA recommended dose of] 1800 mg/day").

Pfizer engaged in fraudulent off-label promotion of Pristiq by having its reps use the Liebowitz and Boyer clinical studies to promote the efficacy of Pristiq at the 100 mg dose, without also having the reps disclose the FDA's conclusions that (1) no additional benefit had been established above the 50 mg dose, and (2) adverse events and discontinuations were more frequent at doses higher than the 50 mg dose. Complaint Paras. 86, 87, 88, 90, 100, 102.

## VI. Relators' reverse false claims allegations are properly based on Pfizer's contractual obligations under Pfizer's Corporate Integrity Agreement.

Reverse false claims liability can be properly based on a defendant's contractual obligation with the Government. *United States ex rel. Matheny v. Medco Health Solutions, Inc.*, 671 F.3d 1217, 1223 (11th Cir. 2012); *United States v. Pemco Aeroplex, Inc.*, 195 F.3d 1234, 1237 (11th Cir. 1999) (en banc); *United States ex rel. Drake v. Norden Systems, Inc.*, 2000 WL 1336497, *12 (D. Ct. 2000). Here, the Corporate Integrity Agreement (CIA) is a contract between Pfizer and the Government. Pfizer's obligations under the CIA, therefore, are contractual obligations. *Matheny*, 671 F3d at 1223 (reversing dismissal of a relators' reverse false claim based on defendants' failure to identify, report and remit excess government payments in accordance with a CIA). In particular, the stipulated daily penalty of $2500 is defined to be "a contractual remedy."

Contrary to Pfizer's argument, Pfizer's contractual obligation under the CIA for failing to report a "reportable event" is not a contingent obligation. Pfizer's arguments "ignore the complaint's allegations" that Pfizer "had a specific legal obligation" under the CIA to report the alleged reportable event. *Pemco Aeroplex,* 195 F.3d at 1237. Pfizer cannot win its motion to dismiss by disputing the complaint's factual allegations. The complaint adequately alleges "a specific, ongoing obligation during the life of the [CIA] contract." *Id.* In addition the stipulated daily amount is fixed (and, therefore, not contingent), even though it need not be to constitute an "obligation" under the reverse false claims provision. *United States ex rel. Bahrani v. Conagra, Inc.,* 465 F.3d 1189, 1202 (10th Cir. 2006) (noting that a § 3729(a)(7) "obligation" need not be for a precise amount in order to be actionable).

Contrary to Pfizer's argument, the stipulated daily penalty of $2500 is not a "potential fine" or "potential penalty". Pfizer has an existing obligation under its CIA, not merely a potential obligation that might arise at some point in the future from an as-yet not existing enforcement action. Moreover, unlike a potential fine or potential penalty, here the stipulated penalty has been fixed and agreed upon.

Pfizer's argument that it does not have a reverse false claim "obligation" under the CIA fails because Government officials always have some discretion in deciding how to react to a contractual breach, but that fact does not mean that contractual obligations are not "obligations" under the reverse false claims provision. *Bahrani,* 465 F.3d at 1204 ("government officials may have discretion as to whether to insist on a party's performance under a contract or whether to file a breach of contract action if a party does not perform. However, a contractual obligation falls within the scope of § 3729(a)(7)"); *Pemco,* 195 F.3d at 1237 (concluding that "a specific, ongoing obligation during the life

of the contract" was covered by § 3729(a)(7)); *American Textile Manufacturers Institute, Inc. v. The Limited, Inc.,* 190 F.3d 729, 741 (6th Cir. 1999) (§ 3729(a)'s definition of 'obligation' certainly includes those arising from … breaches of government contracts"). The fact there may be "some discretion in play" in how the Government chooses to respond to Pfizer's failure to report a reportable event under the CIA does not take this obligation "outside the scope of § 3729(a)(7)" because "[s]ome discretion inheres in a wide variety of government decisions," including how to react to a breach of a contract with the Government. *Bahrani,* 465 F.3d at 1204.

Pfizer's reliance on *United States ex rel. Marcy v. Rowan Companies, Inc.,* 520 F.3d 384, 391-92 (5th Cir. 2008) is misplaced.  Marcy's "obligation" for fines that could have been imposed under the Clean Water Act had the Government known of the defendants' environmental violations arose "from the general environmental laws, not any particular contractual relationship between the government and the defendant." *Marcy,* 520 F.3d at 391.  Here, however, Pfizer's obligation arises precisely from its CIA contract with the Government.  Moreover, the Fifth Circuit in *Marcy* was concerned that "even when a statute requires immediate action from a violator, the government must still choose whether to impose a penalty." *Marcy,* 520 F.3d at 391.  Here, however, the Government has already chosen a "stipulated daily penalty."

### VII.   Relators' kickback allegations are properly alleged and should not be stricken.

Relators' kickback allegations are properly alleged as one part of Pfizer's overall effort to illegally promote off-label prescriptions of Geodon and Pristiq.  Indeed, it is common for relators to allege that kickbacks to physicians were one part of a pharmaceutical manufacturer's overall effort to illegally promote off-label prescriptions.

23

*See United States ex rel. Duxbury v. Ortho Biotech Products, L.P.,* 579 F.3d 13, 33 (1st Cir. 2009); *United States ex rel. Franklin v. Parke-Davis, Division of Warner-Lambert Co.,* 147 F.Supp.2d 39, 46 (D. Mass. 2001) (Saris, J.); *United States ex rel. Bennett v. Medtronic, Inc.,* 747 F.Supp.2d 745, 758 (S.D. Tex. 2010).

Contrary to Pfizer's argument, Relators have adequately alleged that the speaker and consultant payments were for other than fair market value because Paragraph 114 of the Fifth Amended Complaint specifically alleges that the expanded promotional speaker program "violated the Anti-Kickback Act, 42 U.S.C. § 1320a-7b." As the First Circuit has held, "[t]o survive a motion to dismiss, a complaint must set forth 'factual allegations, either direct or inferential ....'" *New York v. Amgen,* 652 F.3d 103, 109 (1st Cir. 2011). Here, Paragraph 114 contains an obvious inferential allegation that these payments are for other than fair market value because (1) the payments are alleged to have violated the Anti-Kickback Act, and (2) the Anti-Kickback Act contains a specific safe harbor for fair market value payments for services.

Because Relators' kickback allegations simply describe one type of conduct by Pfizer that caused the submission of claims for off-label use, those allegations are relevant rather than immaterial and should not be stricken under Fed.R.Civ.P. 12(f). *United States ex rel. Colquitt v. Abbott Laboratories,* 864 F.Supp.2d 499, 536 (N.D. Tex. 2012) ("To be clear, to the extent that Colquitt's kickback allegations simply describe conduct by the Defendants that caused the submission of claims for off-label use, those allegations describe additional instances of Colquitt's off-label promotion claims--that is, efforts by the Defendants to induce off-label use of their stents"). Furthermore, Pfizer has failed to meet its high burden required to have this Court exercise its discretion under Rule 12(f) to strike Paragraph 114. As the First Circuit has held, such motions are

24

"disfavored in practice, and not calculated readily to invoke the court's discretion." *Boreri v. Fiat S.p.A.*, 763 F.2d 17, 23 (1st Cir. 1985).

### VIII.   The Fifth Amended Complaint complies with Rule 9(b).

Pfizer's assertion that Relators have not pled representative examples of the false claims alleged is inaccurate. Pfizer's Motion at 26. In fact, Paragraph 69 describes two specific false claims to Illinois Medicaid for Geodon prescribed to a ten-year-old named DW at Granite City Hospital by Dr. Yanamadala in March 2011 at 20 mg twice daily and by Dr. Gunderson in April 2011 at 80 mg twice daily. Paragraph 69 further alleges that Relator Hebron promoted Geodon off-label for use with children and adolescents to both of these doctors, both of whom have substantial Medicaid practices, and that "[o]ther Pfizer sales reps such as Jim Logan have continued to promote Geodon for children and adolescents to Dr. Yanamadala and Dr. Gunderson ... for off-label purposes up through the present date ...."[10]

Pfizer's attempt to prevent its continued fraudulent conduct after its $2.3 billion settlement from being subject to discovery should be denied because courts generally do not dismiss qui tam complaints for lack of particularity under Rule 9(b) unless the relator is unable to plead even one example of an actual alleged false claim. *United States ex rel. Karvelas v. Melrose-Wakefield Hospital*, 360 F.3d 220, 234 (1st Cir. 2004) ("As the district court correctly concluded, Karvelas' failure to identify any actual false claims that the defendants submitted to the government is, ultimately, fatal to his complaint"); *United States ex rel. Walsh v. Eastman Kodak Co.*, 98 F.Supp.2d 141, 147 (D. Mass. 2000) (Saris, J.) ("Without citing a single false claim arising from an allegedly false invoice,

---

[10] These two claims are representative examples because the Complaint alleges one unitary scheme by Pfizer. *See* Count I and Paras. 50, 56, 72, 75, 114 and 115.

Relator has not met even a bare-bones Rule 9(b) test"); *Gublo v. NovaCare, Inc.*, 62 F.Supp.2d 347, 354 (D. Mass. 1999) (Stearns J.) (dismissing relators' prosthetics claim where "the plaintiffs simply allege three methods by which NovaCare is said to have inflated its bills to the government, without citing a single instance of a false claim").

Put another way, "at least one claim [must] be pleaded with specificity" for a relators' FCA complaint to survive a motion to dismiss under Rule 9(b). *United States ex rel. SNAPP, Inc. v. Ford Motor Co.*, 618 F.3d 505, 514 (6th Cir. 2010); *United States ex rel. Bartlett v. Tyrone Hospital, Inc.*, 234 F.R.D. 113, 122 (W.D. Pa. 2006) ("the Court believes that evidence of at least one specific claim ... is required to inject the necessary precision required of a Rule 9(b) pleading in the Third Circuit"); *United States ex rel. Schmidt v. Zimmer, Inc.*, 2005 WL 1806502, *3 (E.D. Pa. 2005) (to survive a Rule 9(b) motion to dismiss, a relator "must come to court with at least one claim in hand").

Here, Paragraph 69 and Complaint Exhibits 36A – 36D describe two specific sample claims. That clearly is sufficient to meet Rule 9(b). *United States ex rel. Bane v. Breathe Easy Pulmonary Services, Inc.*, 2007 WL 4885468 (M.D. Fla., November 30, 2007) (denying motion to dismiss under Rule 9(b) where relator described one specific false claim); *United States ex rel. Turner v. Michael Jackson & Associates, LLC*, 2007 WL 496384, *4 (S.D. Ill. 2007) (declining to dismiss qui tam counts where there is "a specific example" of one particular Medicare claim).

In addition to the two sample claims described in Paragraph 69, Relators have also "alleged the submission of false claims across a large cross-section of providers that alleges 'the who, what, where and when of the allegedly false or fraudulent representation.'" *Duxbury* 579 F.3d 13 at 30.   As summarized in **Exhibit 8**, in Paragraphs 57c, 57d, 58d, 60e, 60g, 60i, 66i, 66j, 67d, 67f, 67g, 69, 75, 93, 94, 101, 114,

128 and 129, the Relators have identified 38 medical providers (the who), the illegal promotions made to each provider (the what), the rough time periods and locations (the where and when), and inferentially the filing of the false claims themselves to the Medicaid and Medicare programs. *Id.* That is sufficient to meet the First Circuit's *Duxbury* standard, especially because "Duxbury does not identify specific claims," while here the Relators have identified at least two specific claims. *Id.*

This complaint pleads adequately that Pfizer's illegal off-label promotion "caused the submission of false claims" by "provid[ing] factual and statistical information regarding claims for payment". *United States ex rel. Westmoreland v. Amgen, Inc.,* 738 F.Supp.2d 267, 279 (D. Mass. 2010) (denying Rule 9(b) motion to dismiss). Specifically, as shown by the chart attached as **Exhibit 8**, this complaint, like the *Westmoreland* complaint found to have satisfied Rule 9(b), lists specific physician practices at which Pfizer illegally promoted Geodon and Pristiq for off-label uses and also describes the relative amount of Medicaid and Medicare patients at these practices. *Id.* In addition, Paragraph 75 describes how sales reps were provided data on a weekly basis by Pfizer showing " what the recent script history [of doctors were] and specifically what was invoiced to Medicare and Medicaid." Taken all together, Relators have "alleged facts that false claims were in fact filed by the medical providers [they] identified, which further supports a strong inference that such claims were also filed nationwide." *Duxbury,* 579 F.3d at 31.

Pfizer's reliance on this Court's decision in *Nowak* is misplaced. In *Nowak,* the relator "has not alleged *any* fraudulent or false *claim* with particularity." *Nowak,* 806 F.Supp.2d at 356. Here, Relators have specifically alleged at least two false claims with particularity. In addition, Nowak did "not allege that Medtronic *intended* the government

to pay for the biliary stents that were not medically necessary." *Id.* at 357. Here, however, Paragraph 66k alleges that "Pfizer specifically attempted to increase its sales of Geodon by targeting child psychiatrists who had high numbers of Medicaid patients" and that "Pfizer was seeking increased Geodon prescriptions for Medicaid patients."

### IX.    Relators adequately allege that Pfizer knowingly caused the submission of false and fraudulent claims.

Relators adequately allege that Pfizer knowingly caused the submission of false or fraudulent claims to the Medicaid and Medicare programs by illegally promoting off-label prescriptions of Geodon and Pristiq knowing that such prescriptions would result in reimbursement claims when those drug orders were filled by pharmacies.[11] First, the Complaint alleges that Geodon and Pristiq are prescription drugs. Paras. 30-31. And second, the Complaint alleges that Pfizer knowingly caused physicians to present false and fraudulent claims to the Medicare and Medicaid programs. Para. 152.

The fact that the reimbursement claims were submitted by pharmacies after having filled physician prescriptions, rather than by the ordering physicians, does not mean that the Complaint has failed to adequately allege that Pfizer knowingly caused the false or fraudulent claims. Because Geodon and Pristiq are prescription drugs, it was a "natural, ordinary, and reasonable consequence" of its off-label promotion scheme that the physician prescriptions caused by Pfizer's conduct would result in reimbursement claims being submitted by pharmacies to the Medicaid and Medicare programs. *Nowak,* 806 F.Supp.2d at 349 ("In order for her § 3729(a)(1) claim to succeed, Nowak must demonstrate that Medtronic knew that healthcare providers would submit false claims for

---

[11] *See Carpenter,* 723 F.Supp.2d at 405 (denying motion to dismiss based on alleged insufficient pleading of causation) ("Causation is not a stringently enforced FCA element").

reimbursement as a 'natural, ordinary and reasonable consequence of its' off-label promotion scheme").

The Complaint also alleges that Pfizer illegally promoted Geodon for off-label purposes to physicians with substantial numbers of Medicaid and Medicare patients. Paras. 60e; 60g; 66i; 66j; 66k; 69; 70g; 114i; 128; 129; 130. Pfizer sales reps specifically "told physicians with large numbers of Medicaid patients that Illinois Medicaid would pay for up to 240 mg of Geodon per day and Texas Medicaid would pay for up to 360 mg per day as a means to encourage physicians to increase the dosage of their Geodon prescriptions." Para. 70g. The Complaint similarly alleges that Pfizer illegally promoted Pristiq for off-label purposes to physicians with a significant Medicare/Medicaid practice. Paras. 93; 94; 101.

Because "much knowledge is inferential," the Complaint alleges sufficient facts to infer that Pfizer intended that the physicians to whom it illegally promoted Geodon and Pristiq for off-label purposes would write prescriptions which in turn would lead inevitably to false and fraudulent claims to the Medicaid and Medicare programs. *Nowak*, 806 F.Supp.2d at 350 (denying Rule 12(b)(6) motion to dismiss where relators' complaint did not specifically allege "that Medtronic intended that its customers then submit reimbursement claims to the government" because the complaint alleged "sufficient facts to infer that Medtronic intended that the physicians … would use the [Medtronic] stents in routine vascular stinting procedures that would, in turn, form the basis of reimbursement claims to the government").

As Judge Saris held in the *Parke-Davis* off-label promotion FCA case, "it was foreseeable that Parke-Davis's conduct (including non-fraudulent promotion of off-label Neurontin uses) would ineluctably result in false Medicaid claims." *United States ex rel.*

*Franklin v. Parke-Davis, Division of Warner-Lambert Co.,* 2003 WL 22048255, *5 (D. Mass., August 22, 2003). That holds true in this case as well because, as Judge Saris observed when partially denying Parke-Davis's motion to dismiss, "the participation of doctors and pharmacists in the submission of false Medicaid claims was not only foreseeable, it was an intended consequence of the alleged scheme of fraud." *Franklin*, 147 F.Supp.2d at 52-53.

### X.   Relator Booker's retaliation claim is alleged adequately.[12]

On May 20, 2009, Congress enacted the Fraud Enforcement and Recovery Act of 2009 (FERA), which amended Section 3730(h) of the False Claims Act to prohibit retaliation against any employee "because of lawful acts done by the employee ... in furtherance of other efforts to stop 1 or more violations of this subchapter." This amendment was effective on May 20, 2009. *Manfield v. Alutiiq International Solutions, Inc.,* 851 F.Supp.2d 196, 201 n.6 (D. Me. 2012). "Post-FERA, lawful acts done 'in furtherance of other efforts to stop' a violation of the FCA are protected conduct." *Id.* at 202. "Just as an employee's internal complaints which relate to an FCA violation would be considered 'conduct that reasonably could lead to a viable FCA action' under *Karvelas*, they would also naturally fall within the ambit of an 'effort to stop' a violation under the amended section 3730(h)." *Id.*

The First Circuit gives the scope of protected activity under Section 3730(h) a "broad interpretation" consistent with the legislative history of the False Claims Act. *Id.* at 236. To qualify as having engaged in protected activity, the employee must "be

---

[12] "A retaliation claim under 31 U.S.C. § 3730(h) does not require a showing of fraud and, therefore, need not meet the heightened pleading requirements of Rule 9(b)." *Karvelas,* 360 F.3d at 236 n.23. Moreover, "[a] retaliation claim may survive even if the whistleblower claim on which it is based does not." *United States ex rel. Provuncher v. Angioscore, Inc.,* 2012 WL 1514844, *5 (D. Mass, May 2, 2012)(Stearns, J.).

actually engaged in investigating matters that at least reasonably could lead to an FCA action." *Provuncher,* 2012 WL 1514844, *5; *Karvelas,* 360 F.3d at 237. This is an objective test and does not depend on the subjective intent of the relator. *United States ex rel. Gobble v. Forest Laboratories, Inc.,* 729 F.Supp.2d 446, 449-50 (D. Mass. 2010) (Gorton, J.); *Jewell v. Lincare, Inc.,* 810 F.Supp.2d 340, 344 (D. Me. 2011) ("The definition of 'protected conduct' set forth in *Karvelas* is broad and objective"). Under this test, a relator "need not have known that his actions could lead to a qui tam suit under the FCA, or even that a False Claims Act existed, in order to demonstrate that he engaged in protected conduct." *Karvelas,* 360 F.3d at 237.

The Complaint makes adequate factual allegations that Relator Booker was engaged in investigating matters that at least reasonably could lead to an FCA action. Paras. 128, 130, 132-35, 139, 140, 142, 143. These factual allegations of Relator Booker's repeated objections to Pfizer's off-label promotion are analogous to conduct by other relators held to constitute "protected activity" by courts in the District of Massachusetts. *United States ex rel. Bartz v. Ortho-McNeil Pharmaceutical, Inc.,* 856 F.Supp.2d 253, 271-72 (D. Mass. 2012) (Stearns, J.); *United States ex rel. Bierman v. Orthofix International, N.V.,* 748 F.Supp.2d 117, 122 (D. Mass. 2010) (Harrington, J.); *Gobble,* 729 F.Supp.2d at 449-50.

Pfizer argues that "Booker's supposed whistle blowing activity concerned only Pfizer's alleged violation of FDA marketing regulations and thus was not 'in furtherance of' exposing false claims for payment." Pfizer's Motion at 33. But Pfizer ignores case law establishing that to be engaged in protected activity under Section 3730(h), an employee must only be engaged in "investigating matters that at least reasonably could lead to an FCA action" as judged on an objective standard. *Karvelas,* 260 F.3d at 237;

31

*Provuncher,* 2012 WL 1514844, \*5; *Gobble,* 729 F.Supp.2d at 449-50; *Jewell,* 810 F.Supp.2d at 344.

In *Gobble,* Judge Gorton held that an employee's internal complaints about the employer's off-label promotion of Celaxa and Lexapro for use in children and adolescents "concerned conduct that was actionable under the FCA and thus his activities reasonably could have led (and did lead) to a viable FCA action." *Gobble,* 729 F.Supp.2d at 450. Judge Gorton's analysis in *Gobble* applies here. Like Pfizer does here, Forest Labs in *Gobble* argued that "Gobble's complaint does not explicitly tie his retaliation claim to fraud on the government." *Id.* However, in both cases the relators' complaint "does generally describe how his inquiries support an FCA claim," particularly when all allegations are considered together with the retaliation claim and when all inferences are drawn, as they must be, in favor of the relator. *Id.*

Moreover, Relator Booker's conduct as pled is similar to the conduct found by Judge Gorton to be adequate to put Forest Labs on notice of Relator Gobble's protected activity. *Id.* at 451 ("The Court is convinced that Gobble has adequately pled that the defendants were on notice of and knew about his protected conduct. His complaint contains several allegations of complaints and inquiries to his supervisors about the allegedly unlawful kickbacks and off-label promotions").

"To clear the low bar required to establish a prima facie case [for an FCA retaliation claim], the fact that high-level executives learned of the appellant's whistle blowing several months before his firing suffices to show knowledge" by the employer.[13]

*Harrington v. Aggregate Industries-Ne. Region, Inc.,* 668 F.3d 25, 32 (1st Cir. 2012).

---

[13] "Ordinarily, an employer is charged with knowledge that an employee is engaged in protected conduct when the employer is put on notice that the employee is taking action that reasonably could lead to an FCA case." *Maturi v. McLaughlin Research Corp.,* 413 F.3d 166, 173 (1st Cir. 2005).

Here, District Manager Twidwell and Pfizer's Corporate Compliance Officer knew about Relator Booker's whistle blowing several months before Booker was fired and Regional Manager Sanderson knew about it several weeks before Booker was fired. Paras. 128, 130, 132-135, 142. That is sufficient to meet the pleading requirements to survive a motion to dismiss.

Pfizer's knowledge of Relator Booker's protected activity is adequately alleged because Pfizer managers knew from Booker's continued objections to Twidwell's off-label promotion strategy that his concerns were ongoing. *Nowak,* 806 F.Supp.2d at 341 (holding that "Nowak has adequately pled that Medtronic was on notice that her conduct could lead to an FCA action" where "Medtronic's management ... knew that her concerns were ongoing because her quarterly reports indicated that she would not sell off-label devices"). Furthermore, post-FERA, "the act of internal reporting itself suffices as both the effort to stop the FCA violation and the notice to the employer that the employee is engaging in protected activity." *Manfield,* 851 F.Supp.2d at 204.

The Complaint makes adequate factual allegations that Relator Booker was fired because of his investigating matters that at least reasonably could lead to an FCA action. To be liable for an FCA retaliation claim, the employer need only be "motivated, at least in part by the employee's engaging in protected activity." *Karvelas,* 360 F.3d at 239 (*quoting* S.Rep. No. 99-345, at 35). Here, Relator Booker earned a national award for Geodon sales in September 2009. Para. 12. He also had the highest sales in his district and ranked in the top 5 percent of sales in his region in the fourth quarter of 2009. Para. 12. Yet Booker was summarily fired on January 6, 2010, the day after his email to Pfizer Corporate Compliance and within three weeks of his complaints to Regional Manager Sanderson. Para. 276. The inferences from these facts are sufficient at this stage of the

case to constitute an adequate pleading that Pfizer fired Relator Booker at least in part because of his protected activity. *Nowak*, 806 F.Supp.2d at 341 ("The inferences are sufficient, at this stage in the case, to constitute an adequate pleading that Medtronic fired Nowak 'at least in part' because of her 'protected activity'" where Nowak was ranked second highest in her region at the end of October 2008 and was placed on probationary status in February 2009).

The fact that only approximately three weeks separated Relator Booker's conversation with Regional Manager Sanderson on December 14, 2009 and his firing on January 6, 2010 suggests that Relator Booker was fired, at least in part, because of his complaints about Pfizer's off-label promotion of Geodon. *Manfield*, 851 F.Supp.2d at 205 (finding that "there is at least some factual support in the Complaint for a finding that the Defendants were motivated to fire Manfield, at least in part," by Manfield's internal complaints due to the "temporal proximity" of 19 days between the relators' complaint to a project manager and the relators' firing); *Jewell*, 810 F.Supp.2d at 345 ("Plaintiff alleges that he was fired soon after making his protected conduct known to his supervisor. Accordingly, Plaintiff's allegations constitute a sufficient basis to conclude that Jewell was fired because of the protected conduct. His retaliatory termination claim, therefore, survives").

Pfizer's assertion that Relator Booker "does not allege who notified him of his termination, what the proffered reason for his termination was, or who at Pfizer knew about his lawful conduct and acted upon that information to devise and execute a retaliatory firing," Pfizer Motion at 33-34, is insufficient to justify dismissing Booker's retaliation claim because an FCA retaliation claim "need not meet the heightened pleading requirements of Rule 9(b)." *Karvelas,* 360 F.3d at 236 n.23.

34

Pfizer's argument that "the Court cannot draw a 'plausible inference' that Pfizer retaliated against [Booker] for sending an email to Corporate Compliance one day earlier", Pfizer's Motion at 34, is a straw man argument because the Complaint does not make that allegation. Moreover, Pfizer's argument conveniently ignores the four-month period during which Booker was repeatedly blowing the whistle to District Manager Twidwell, Regional Manager Sanderson, and Pfizer's Corporate Compliance office, as well as the three-week period between Booker's complaint to Regional Manager Sanderson and Booker's firing.

In summary, the Complaint makes adequate factual allegations that Relator Booker was engaged in investigating matters that at least reasonably could lead to an FCA action; that Pfizer knew of Booker's protected activity; and that Pfizer fired Booker because of his protected activity. That is enough to survive a motion to dismiss.

Respectfully submitted,

| | |
|---|---|
| Thomas N. Burnham | Kevin J. Darken |
| Michigan Bar P23311 | Florida Bar No. 0090956 |
| Burnham International Law Office, PC | kdarken@tampalawfirm.com |
| 4140 Miller Road | THE COHEN LAW GROUP |
| Ann Arbor, Michigan 48103 | 201 East Kennedy Boulevard, Ste. 1000 |
| tnburnham@earthlink.net | Tampa, Florida 33602 |
| Counsel for *Qui Tam* Relators | Telephone: (813) 225-1655 |
| Admitted Pro Hac Vice | Facsimile: (813) 225-1921 |
| | Co-Counsel for *Qui Tam* Relators |
| | Admitted Pro Hac Vice |

35

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been sent via CM/ECF to AUSA Zach Cuhna, Trial Attorney Edward Crooke, Department of Justice, and Brien T. O'Connor, Kristen V. Mayer and Emily J. Derr of Ropes & Gray LLP, Prudential Tower, 800 Boylston Street, Boston, Massachusetts 02199 on this 29th day of March 2013.

By: _____

Kevin J. Darken